IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

LISA KIM, individually and on behalf of all others similarly situated,
Plaintiff-Appellee,

v.

RICH ALLISON and STEVE FRYE,
Objectors-Appellants,

v.

TINDER, INC., a Delaware corporation; et al.,
Defendants-Appellees.

On Appeal from the Judgment of the United States District Court for the
Central District of California, Hon. John F. Walter
No. 2:18-cv-30393-JFW

## LISA KIM'S OPPOSITION TO APPELLANT'S OPENING BRIEF

LAW OFFICES OF TODD M.
FRIEDMAN, P.C.
Todd M. Friedman (SBN 216752)
Adrian R. Bacon (SBN 280332)
21550 Oxnard Street, Suite 780
Woodland Hills, CA 91367
Telephone: (877) 206-4741
Facsimile: (866) 633-0228
tfriedman@toddflaw.com
abacon@toddflaw.com

KRISTENSEN LLP
John P. Kristensen (SBN 224132)
12450 Beatrice Street, Suite 200
Los Angeles, California 90066
Telephone: (310) 507-7924
Facsimile: (310) 507-7906
john@kristensenlaw.com

*ATTORNEYS FOR APPELLANT*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................4

JURISDICTIONAL STATEMENT ........................................................8

STATEMENT OF THE CASE..............................................................8

    Proceedings to Date ......................................................................9

    The Settlement ...........................................................................11

       The Settlement Class. ...............................................................11

       Settlement Benefits....................................................................11

          Super Likes are Equivalent to Cash and Are Non-Reversionary ................13

          Additional Cash was Available to All Claimants .........................................14

          Tinder Agreed to Corrective and Meaningful Injunction Relief .................15

    Preliminary Approval .................................................................16

    Delivery of Class Notice.............................................................17

    Reaction of Class Members to the Settlement...................................18

    Proceedings Since Preliminary Approval..........................................19

      Objectors' Concerning History.........................................................20

    District Court's Order Granting Final Approval .................................21

SUMMARY OF ARGUMENT ...........................................................27

ARGUMENT ...............................................................................33

    STANDARD OF REVIEW ............................................................33

LEGAL ARGUMENT .......................................................................... 34

The District Court Correctly Applied Heightened Standards of Pre-

Certification Approval Under The Proper Rules and Precedent ..................... 35

The Class Benefits Were Robust, Widespread, Multifaceted and Therefore

Fair and Reasonable in Relationship to the Considerable Risks ..................... 40

   The Settlement is Fair Compared to Other Unruh Act Class Settlements ...42

   The District Court Correctly Valued the Class Benefits ............................ 45

   This Case Carried Significant Risk ............................................................ 48

The Settlement was not a Reverse Auction ...................................................... 49

The Settlement Does Not Violate the Due Process Rights of Absent Class

Members ............................................................................................................ 55

The District Court Appropriately Analyzed the Reasonableness of the

Attorneys' Fees Under both the Lodestar and Percentage of the Fund Methods

.......................................................................................................................... 59

Class Counsel Conducted Appropriate Levels of Discovery and Objectors

Have Pointed to no Specific Factual Area of Inquiry that was not Investigated

.......................................................................................................................... 62

Kim and Class Counsel Have Adequately Represented the Class ................... 63

CONCLUSION ................................................................................................. 64

CERTIFICATE OF COMPLIANCE FOR BRIEFS ........................................ 66

CERTIFICATE OF SERVICE ...............................................................................67

**Cases**

*Alfred G. Rava v. Athletics Investment Group, LLC*, Case No. RG 06268693,

Superior Court of California County of Alameda (2006) ...................................43

*Allen v. Bedolla*, 787 F.3d 1218 (9th Cir. 2015).......................................... 24, 33, 39

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).................................... 23, 36

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011)......................................58

*Blair v. Rent-A-Center, Inc.*, 928 F.3d 819 (9th Cir. 2019)......................................10

*Candelore v. Tinder, Inc.*, 19 Cal. App. 5th 1138 (2018)................................. 25, 48

*Carter v. City of Los Angeles*, 224 Cal.App.4th 808 (2014) ...................... 24, 43, 47

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361F.3d 566 (9th Cir. 2004) .................. 22, 41

*Cullinane v. Uber Technology, Inc.* 893 F.3d 53 (1st Cir. 2018) ...........................10

*Dep't of Indus. Relations v. Seaboard Surety Co.*, 50 Cal.App.4th 1501 (1996)....57

*Edwards v. Nat'l Milk Producers Fed'n*, No. 11-CV-04766-JSW, 2017 WL

3623734 (N.D. Cal. June 26, 2017) ...................................................................56

*Elec. Equip. Express, Inc. v. Donald H. Seiler & Co.*, 122 Cal. App. 3d 834 (1981)

.............................................................................................................................57

*Fox v. Vice*, 563 U.S. 826 (2011)................................................................... 52, 60

*Fraley v. Facebook, Inc.*, 2016 WL 145984 (9th Cir. Jan. 6, 2016) ......................46

*Gailing v. Rose, Klein & Marias*, 43 Cal.App.4th 1570 (1996)..............................57

*Gordon v. Caribbean Cruise Line, Inc.*, Case No. 14-cv-5848, 2019 WL 498937

(N.D., Ill., Feb. 8, 2019) ........................................................................20

*Hanlon v. Chrysler Corp*., 150 F.3d 1011 (9th Cir. 1998) ............................. passim

*In re Bluetooth Headset Prods. Liab. Litig.,* 654 F.3d 935 (9th Cir. 2011) .... passim

*In re Domestic Air Transp. Antitrust Litig*., 148 F.R.D. 297 (N.D. Ga. 1993) .....55

*In re Hyundai and Kia Fuel Economy Litigation*, 926 F.3d 539 (9th Cir. 2019)

...................................................................................................... passim

*In re Mego Fin. Corp. Sec. Litig*., 213 F.3d 454 (9th Cir. 2000) ...........................33

*In re Online DVD-Rental Antitrust Litig*., 779 F.3d 934 (9th Cir. 2015) ......... 34, 46

*In re Syncor ERISA Litig*., 516 F.3d 1095 (9th Cir. 2008) ......................................33

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291 (9th Cir. 1994) ......60

*Javorsky v. Western Athletic Clubs, Inc.*, 242 Cal. App. 4th 1386 (2015) ........ 26, 48

*Jones v. Wells Fargo Bank, N.A.*, 2015 WL 661757 (Court of Appeal, Second

District, Division 7, California Feb. 17, 2015) ............................................ 43, 44

*Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016)............................................. 52, 60

*Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071 (9th Cir. 2017) ...............................39

*Lane v. Facebook, Inc*., 696 F.3d 811 (9th Cir. 2012)............................................24

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998)...........................33

*London v. Wal–Mart Stores, Inc.,* 340 F.3d 1246 (11th Cir.2003)..........................20

*McGill v. Citibank, N.A,* 2 Cal.5th 945 (2017) ......................................................10

*McQuirk v. Donnelley*, 189 F.3d 793 (9th Cir. 1999)...............................................49

*Minton v. Cavaney*, 56 Cal.2d 576 (1961)................................................................57

*Moralez v. Whole Foods Market, Inc.*, 897 F.Supp.2d 987 (N.D. Cal. Sept. 24, 2012)..............................................................................................................43

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950).................55

*Negrete v. Allianz Life Ins. Co. of North America,* 523 F.3d 1091 (9th Cir. 2008) 50, 51

*Norgart v. Upjohn Co.*, 21 Cal.4th 383 (1999).......................................................57

*O'Connor v. Uber Technologies, Inc.*, 904 F.3d 1087 (9th Cir. 2018)....................25

*Parra v. Bashas', Inc.*, 536 F.3d 975 (9th Cir. 2008)..............................................34

*Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010) ..........................................60

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir.2002)............................50

*Roberts v. AT&T Mobility LLC*, 801 Fed.Appx. 492 (9th Cir. Feb. 18, 2020).........10

*Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) .......................... 23, 46

*Roes, 1-2 v. SFBSC Mgmt.*, 944 F.3d 1035 (9th Cir. 2019) ............................ 38, 39

*Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180 (10th Cir. 2002) ...........50

*Serna v. Big A Drug Stores, Inc.*, No. SACV 07–0276 CJC (MLGx), 2007 WL 7665762 (C.D. Cal. Oct. 9, 2007) ...................................................................20

*Sheikh v. Tesla, Inc.*, Case No. 17-cv-02193-BLF, 2018 WL 5794532 (N.D. Cal. Nov. 2, 2018) ...................................................................................................56

6

*Silber v. Mabo*n, 18 F. 3d 1449 (9th Cir. 1994)......................................................56

*Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990).60

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ................................................39

*United States v. Oregon*, 913 F.2d 576 (9th Cir. 1990)...........................................24

*United States v. Vonn*, 535 U.S. 55 (2002) .............................................................41

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002)............................ 51, 60

*Woods v. Google LLC*, Case No. 11-cv-01263-EJD, 2018 WL 4030570 (N.D. Cal.

Aug. 23, 2018).....................................................................................................20

*Yoon v. Gap, Inc.*, Case No. 08–05712 SVW (AJWx) 2010 WL 11597565 (C.D.

Cal. Oct. 6, 2010) ................................................................................................20

*Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001) ............. 23, 36

**Statutes**

*Cal. Bus. & Prof. Code* §§ 17200, et seq..........................................................9, 47

*Cal. Civ. Code* §§ 51, et seq............................................................................9, 47

**Rules**

Fed. R. Civ. P. 23 ........................................................................................... passim

## JURISDICTIONAL STATEMENT

Plaintiff/Appellee Lisa Kim ("Kim" or "Plaintiff/Appellee") agrees with Objectors Rich Allison and Steve Frye's ("Objectors" or "Appellants") statement of jurisdiction.

## STATEMENT OF THE CASE

Tinder is a smartphone-based dating application used by consumers throughout the world, including California. The app enables users to view profiles of other users in the same geographic locale and to indicate an interest in (i.e., to "like") another user or, alternatively, indicate a lack of interest. If two users indicate an interest in each other's profile, they can then communicate with each other through the app. The app also allows a user to indicate a heightened degree of interest in another user through a feature known as a "Super Like." The app may be downloaded and used for free, but certain additional or premium features can only be accessed by purchasing a subscription to Tinder Plus or Tinder Gold. Such features include, among other things, unlimited likes (whereas the free version has a daily limit), no paid advertisements, the ability to undo dislikes, the ability to view profiles in other locales, and the ability to exert more control over other variables involved in using the app. Subscribers receive more free Super Likes than non-subscribers, but any user of the app may purchase additional Super Likes.

Kim, a female user over the age of 29, alleges that when she and Class Members purchased Tinder premium services (Plus or Gold), Tinder discriminated against them based on age, by charging more money for the same service for consumers age 29 and older. Kim claims Tinder's widespread and uniform conduct is in violation of the Unruh Civil Rights Act, *Cal. Civ. Code* §§ 51, et seq. ("Unruh Act"), which outlaws discrimination by businesses in California. Kim also alleges violations of the Unfair Competition Law, *Cal. Bus. & Prof. Code* §§ 17200, et seq. ("UCL"). Kim sought monetary and injunctive relief on behalf of a class. Tinder vigorously disputed Kim's claims.

## I.     Proceedings to Date

On April 12, 2018, Kim filed her class action lawsuit against Tinder. ER[1] V3 at 373-387. Tinder responded on June 11, 2018 by filing a Motion to Compel Arbitration or Stay. ER V3 at 364-73, SER V1 at 1-2. On June 22, 2018, Kim filed her First Amended Complaint, adding a UCL cause of action for public injunctive relief. SER V1 at 3-20. Tinder argued that Kim entered into an arbitration agreement based on her alleged assent to Tinder's Term of Use through a "sign-up wrap" consent while accessing the app. Tinder's Motion to Compel was granted on July 5, 2018, and the Court compelled Kim's claims to arbitration. ER V3 at 334-

---

[1] "ER" refers to Appellant's Excerpts of Record. "SER" refers to Appellees' Joint Supplemental Excerpts of Record.

41.

On July 16, 2018, Kim appealed, based on her position that the Court did not appropriately consider California Supreme Court precedent interpreting substantive California law in *McGill v. Citibank, N.A,* 2 Cal. 5th 945 (2017). SER V1 at 21-29. Kim's appeal would have raised similar issues to those in *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819 (9th Cir. 2019); and *Roberts v. AT&T Mobility LLC*, 801 Fed.Appx. 492 (9th Cir. Feb. 18, 2020). In addition, Kim would argue that the Court disregarded recent appellate case law, *Cullinane v. Uber Technology, Inc.*, 893 F.3d 53 (1st Cir. 2018), which bore on whether there was assent by Class Members to Tinder's Term of Use. While Kim felt strongly about the merits of the appeal, success was uncertain and application of any ruling would directly impact the rights of 95% of Class Members.

A mediation was scheduled for November 29, 2018, and the Parties stipulated to continue the briefing deadlines. The Parties attended mediation with Judge Meisinger (ret.) on November 29, 2018. Prior to mediation, the Parties exchanged discovery, including the size and composition of the Class, information about the number of Class Members who entered into arbitration agreements, information about Super Likes, documents relating to the merits of the claims and the policies and practices of Tinder. ER V1 at 120-126. The Parties did not resolve the case at the mediation but engaged in subsequent discussions with Judge Meisinger. With

his guidance, this Settlement was reached on December 1, 2018. *Id.* Judge Meisinger submitted a declaration to the Court attesting to the fairness of the settlement and arms-length nature of mediation discussions. SER V1 at 183-185.[2]

## II. The Settlement

### A. The Settlement Class.

The "Settlement Class" is defined in the Agreement as follows:

> *"Every California subscriber to Tinder Plus or Tinder Gold during the Class Period who at the time of subscribing was at least 29 years old and was charged a higher rate than younger subscribers, except those who choose to opt out of the Settlement Class."* (Agreement § 2.21.)

The Class Period is from March 2, 2015 through March 1, 2019. ER V3 at 286. Tinder maintains email addresses for the vast majority of users. Based on data provided by Tinder, the Class contains approximately 240,000 Members. ER V1 at 61.

### B. Settlement Benefits.

Tinder agreed to a multifaceted settlement structure, which includes a universal participation component (automatic benefits to all Class Members), an

---

[2] The record shows zero class settlement discussions between Tinder and Candelore's counsel.

additional cash or cash-equivalent payout to Class Members who submit claims and provide unknown mailing addresses, and an agreement to halt Tinder's allegedly discriminatory practices. These benefits are significant and tangible and offer fair remuneration for the Class. Attorneys' fees, costs, administration expenses, and Incentive Payment will be separately paid by Tinder.[3]

Pursuant to the Agreement, Notice was sent via email to 240,592 persons believed to be in the Settlement Class. ER V3 at 284, 291, 316-18. The Notice explained that if the Member has a Tinder account, or has reactivated a Tinder account associated with the same email address that pertained to their previous account, the Member will automatically receive 50 Super Likes (equivalent to $50 in value). *Id*. This benefit will be issued to every Class Member irrespective of whether they submit a claim. In addition, each Member may submit a claim to obtain one of the following benefits: (1) $25.00 in cash, (2) 25 Super Likes, or (3) a one-month subscription to Tinder Plus or Gold, depending on which service the Member previously purchased. *Id*. at 288-90. Tinder also agreed to halt its age-based price differentiation practices in California. *Id*. Kim estimated this revision to pricing discrimination was worth at least $6 million to the Class. ER V2 at 127.

Separate and apart from these Class benefits, the Parties retained a Settlement

---

[3] These portions of the Settlement were not even discussed until the Class Member benefits were fully negotiated between the Parties.

Administrator and Tinder agreed to pay for any and all administration costs. ER V3 at 291-92, 295. Tinder agreed to a proposed $5,000.00 Incentive Payment to Kim (*Id.* at 297) and a proposed Attorneys' Fee in the amount of $1,200,000.00 plus reasonable cost. *Id.* at 296. Notice was provided within 30 days after Tinder provided the Administrator with Class information.[4] *Id.* at 293. The Administrator developed a Settlement Website, which contains relevant documents, including the Settlement Agreement, Claim Form, Class Notice, and Preliminary Approval Order. *Id.* at 291-92, 294.

### 1. Super Likes are Equivalent to Cash and Are Non-Guaranteed

Class Counsel investigated and conducted pre-mediation discovery and confirmatory discovery on the nature and valuation of Super Likes. The record shows Class Counsel was concerned that there needed to be a guaranteed monetary component automatically provided to all Class Members. Logistically, because Tinder only had email addresses of customers, any monetary relief provided to Class Members required a claim form and could not be automatically provided. Class Counsel settled on the best alternative - to deposit a currency equivalent directly

---

[4] Email was demonstrated by the Parties to be the best notice practicable because Tinder generally maintains email address data for Class Members but not physical addresses or other information (such as landline phone numbers) that would permit Class Counsel to efficiently conduct a reverse lookup and send mail notice.

into accounts of Class Members. The best equivalent to such a solution was determined to be Super Likes. Tinder agreed to automatically deposit 50 Super Likes into every Class Member's account whether or not they filled out a claim form. This was referred to in the Settlement as the "Universal Participation Component."

A Super Like is a premium feature available through the Tinder app which can be purchased on an a la carte basis. ER V2 at 216-219. Tinder generated $96 million in revenue in 2018 from Super Likes purchased on an a la carte basis, making up 12% of Tinder's revenue stream. Super Likes are sold for $1 each. Data provided during discovery confirmed that the average paid member who purchased Super Likes purchased an average of 34 per month. For these reasons, Class Counsel concluded that Super Likes were equivalent to cash benefits because Class Members were regularly purchasing large volumes of Super Likes and would have continued to purchase Super Likes if they were not otherwise provided under the Settlement. This conclusion is supported by discovery and data, including an unrefuted declaration by Tinder's Senior Vice President. There is no evidence supporting Objector's position that Super Likes are not of significant cash-equivalent value to Class Members.

### 2. Additional Cash was Available to All Claimants

Because Tinder did not maintain address or bank account information of

Class Members, there needed to be a claims process for anyone who wanted to receive cash benefits. The record shows that a cash benefit was made available to all Class Members in the amount of an additional $25 per claim. Class Members could elect to take cash or receive 25 Super Likes or a free month of premium services. Three rounds of notice were sent via email to encourage maximum participation, including one round after Final Approval. It was necessary to require a claim form to receive the cash component in this case because Tinder did not have addresses for Class Members. This was confirmed in discovery. ER V1 at 61.

### 3. Tinder Agreed to Meaningful Injunction Relief

One of the primary goals of this litigation was to end Tinder's allegedly discriminatory pricing structure. This is clear from the operative complaint, (SER V1 at 3-20) from the arguments raised in the opposition to the motion to compel (ER V3 at 346-63), and the appeal of the order granting the motion to compel. SER V1 at 21-29.

Tinder agreed as part of the hybrid settlement to no longer discriminate with respect to pricing in California based on age. Class Counsel estimate the value to the Class of this corrective behavior is $6 million. Given that part of Kim's action was designed to end the allegedly unlawful conduct that the Settlement achieved this result which benefits not only all Class Members but every Californian who uses Tinder, there is value in the injunctive component of the Settlement that must

be factored into its fairness.

### III.  <u>Preliminary Approval</u>

After moving for Preliminary Approval, Allen Candelore, a non-party, submitted an objection to the settlement but purposefully chose not to seek to intervene. ER V2 at 220-44. Kim and Tinder separately responded to the Objection. SER V1 56-72. The Court took the Motion under submission and issued a detailed Order granting Preliminary Approval. ER V1 at 36-53. The Order "considered the objections and issues raised in Candelore's Opposition" (Id. at 41), which are essentially identical to those raised by Objectors at Final Approval and on Appeal. *Compare* ER V2 at 220-44 *with* ER V2 at 134-192.

In granting Preliminary Approval, the Court thoroughly analyzed all elements of Rule 23 to determine whether the requirements of certification were met, as well as whether the fairness requirements under Rule 23(e) were met. The Court found the notice requirements under Rule 23(c)(2)(B) were met by the direct email notice plan. ER V1 at 48-49. The Court looked at whether the remuneration was fair and reasonable for the Class given the remedy available under the UCL and Unruh Act and determined the "Settlement award that each Class Member will receive is fair, appropriate, and reasonable given the purposes of the Unruh Act and UCL." *Id*. at 50-51. Further, the Court found the incentive award and fees negotiated appeared preliminarily fair and reasonable and free from collusion, subject to a final review

of counsel's time records at Final Approval. *Id.* at 51-53.

### IV. <u>Delivery of Class Notice</u>

Class Notice was sent via email by the Claims Administrator on April 5, 2019. ER V2 at 67. The campaign was highly successful at delivering targeted notice directly to the hands, pockets, and bedside tables of Class Members. A total of 240,592 emails were sent to Class Members, with 203,741 of those emails delivered. Email addresses for all but 19 Class Members were located in Tinder's records. ER V2 at 131. Notice was posted on the Settlement Website maintained by Epiq. ER V2 at 68. Class Members were permitted to submit claims until 30 days after Final Approval.

Class Counsel negotiated three rounds of notice to the Class. A second round of notice was emailed on May 17, 2019. ER V2 at 67-68. A third notice was sent after the Court ruled on Final Approval. SER V2 at 224-35. Ultimately, 85% of Class Members were provided direct notice. ER V2 at 67.[5] Class Members who do not make claims are still receiving substantial benefits automatically.

---

[5] The final claims rate on cash benefits is significantly higher than intimated by Objectors, whose representations derive from the number of claims made after the first of three rounds of notice. Class Counsel can advise the Ninth Circuit that the final claims rate falls squarely within the 1-3% range typically seen in claims-made settlements.

## A. Reaction of Class Members to the Settlement

Contrary to how Objectors have framed the issue, the reaction of Class Members was overwhelmingly positive, with 99.9% electing to participate either actively or passively after notice. There were only two opt outs from consumers who were not represented by objectors' counsel in active cases. All remaining objections and opt-outs came from sources that could be anticipated at the time of Preliminary Approval, i.e., law firms who represented class members with similar claims.[6] It was unsurprising that Candelore's counsel objected to the settlement, given their history with Class Counsel.[7]

Candelore did not object to and instead opted out of the Settlement and submitted a declaration in support of Objectors, who are supported by his same counsel. In addition to these objections/opt outs, there were four identical objections and approximately 200 identical opt-outs from Davis & Norris, LLP, an Alabama law firm that represented these individuals in arbitrations after solicited consumers

---

[6] There were a total of six objections between two law firms. There were a total of 238 opt outs. 235 of them were made by the David and Norris objectors, who were in litigation with Tinder. Tinder provided evidence that 45 of these opt outs were not Class Members. One was Candelore, also in active litigation. The only timely organic opt out was Sean Gay. Fariborz Kevin Hatanian submitted a late opt out but his request was honored. SER V2 at 226.

[7] Candelore knowingly top-filed Class Counsel, who filed the first-filed action (*Warner v Tinder*) and refused an offer by Class Counsel to jointly prosecute the cases.

to bring claims. It would be expected that a firm representing 200 consumers in individual arbitrations would opt its clients out, since the Unruh Act has an attorneys' fee-shifting provision and the firm has presumably spent resources litigating those claims for which it could not recover if its clients did not opt out. It is less clear why this firm chose to object, but in any event they were largely defective and not at issue on appeal.

There was no resistance to the Settlement from the other over 240,000 Class Members. None objected, and only two opted out. The only resistance came from attorneys who are predictably concerned with maintaining their right to seek legal fees. That, however, does not serve as a basis to credit their objections or to deny compensation to the over 99.9% of Class Members who chose to be part of this robust Settlement after receiving notice.

## V.    Proceedings Following Preliminary Approval

After the Motion for Final Approval was filed, depositions were scheduled for May 16, 2019 for Objectors and third-party quasi-objector Candelore. None appeared, and notices of nonappearance were taken. SER V2 at 388-412. Kim moved to compel the depositions. Objectors' counsel offered to respond to five Interrogatories in response to the motion to compel. ER V2 at 86-88.[8] The

---

[8] "I offered a reasonable alternative: that each individual respond to a limited number (five) of Interrogatories and that we would shorten the time for responding so that

Magistrate ordered Objectors to each answer five Interrogatories.  *Id.*

Interrogatories were served (SER V2 at 259-65) and Objectors responded with

boilerplate objection and non-answers.  *Id.* at 266-91.

## A. Objectors' Concerning History

Objectors' counsel Alfred Rava's close personal and business relationship

with Candelore and Objectors were subject to litigation during Final Approval and

is relevant to this Appeal.  Class Counsel believed this history created an

irreconcilable conflict of interest, which rendered Mr. Rava inadequate counsel, and

Objectors and Candelore inadequate representatives.[9]  This history was extensively

discussed in Kim's Reply in support of Final Approval, and accompanying

Declaration of Class Counsel.  SER V2-3 at 186-576.

Class Counsel took the position that, in light of these issues, it appeared

Candelore did not object, and opted out to circumvent Rule 23(e)(5)(B)(i).  Class

---

Ms. Kim would receive responses in advance of any filing deadlines for responding
to objections."

[9] *See Gordon v. Caribbean Cruise Line, Inc.*, Case No. 14-cv-5848, 2019 WL
498937 at *8-9 (N.D., Ill., Feb. 8, 2019) (close personal ties between class counsel
and class representative rendered them inadequate); *London v. Wal–Mart Stores,
Inc.,* 340 F.3d 1246, 1255 (11th Cir.2003) (same); *Serna v. Big A Drug Stores, Inc.*,
No. SACV 07–0276 CJC (MLGx), 2007 WL 7665762 *2-3 (C.D. Cal. Oct. 9, 2007)
(business relationship between a class representative and counsel may give rise to a
conflict of interest); *Yoon v. Gap, Inc*., Case No. 08–05712 SVW (AJWx) 2010 WL
11597565 *6 (C.D. Cal. Oct. 6, 2010) (same); *Woods v. Google LLC*, Case No. 11-
cv-01263-EJD, 2018 WL 4030570 *4-7 (N.D. Cal. Aug. 23, 2018).

Counsel was concerned with respect to the relationship between Candelore, who had an active case and opted out, and the Objectors, who remained Class Members and objected through the same counsel using the same arguments. Such circumstances raised concerns that Objectors were being used as shills to leverage a large individual settlement in the *Candelore* action, without the requirement that any such settlement would need to be disclosed to the District Court.[10] SER V2-3 at 186-576. This was but one of the reasons Class Counsel argued the Objectors' conduct should be viewed with skepticism.

## VI.    District Court's Order Granting Final Approval

The District Court issued a thorough eighteen-page Order granting Final Approval, after holding oral argument and reading three rounds of briefing on all Rule 23(e) fairness issues raised by two sets of objectors. ER V1 at 18-35. The District Court allowed Objectors to argue at the hearing and indicated that all papers had been considered. Particularly of interest was the Court's assessment of merits issues, where it recognized the split in authority between *Candelore* and *Jaworski*, as well as the procedural posture of each case (with *Candelore* being a motion to

---

[10] Theoretically, a payment made to Candelore, a non-class member, would not need to be disclosed, yet an agreement to withdraw the objections of Candelore's friends could nonetheless be conditioned (off the record) on a large individual payout to Candelore for resolution of his individual claims. Class Counsel wanted to ensure the integrity of the class action device by shining a spotlight on this potential dynamic.

dismiss and *Jaworski* being a summary judgment ruling). *Id.* and SER V3 at 639-643.

The District Court's Order was thorough, cited all applicable Ninth Circuit authority, and was not particularly controversial in its findings. The Court laid out the procedural history of the case, summarized the terms of the Settlement, and reviewed the notice process, including the fact that 85% of Class Members were "reached" via direct notice to the very email addresses used in conjunction with their Tinder accounts. The Court noted that as of June 3, 2019 (i.e. after the first of three rounds of notice) there were 1,794 claims received.[11] The Court went on to accurately characterize the objections from the two law firm groups that were actively representing Class Members.

After accurately describing the claims, the terms of the Settlement, and the opt outs and objections, the Court turned to the legal standards under Ninth Circuit jurisprudence. The Court's Order cited to the following cases for these standards:

- *Churchill Vill., L.L.C. v. Gen. Elec.*, 361F.3d 566, 575, 577 (9th Cir. 2004) (discussing the class action settlement procedure, citing reaction of class

---

[11] Additional reminder notices were given after this date and the claims rate increased considerably thereafter.

members as a factor and affirming final approval where 0.61% of class members opted out or objected);

- *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (district court must apply undiluted, even heightened, attention to certification in the settlement context to protect absentees);

- *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001) (describing the Rule 23 factors);

- *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) (describing standards for settlement approval and noting courts' duty to review for collusive settlements);

- *In re Hyundai and Kia Economy Litigation ("In re Hyundai")*, 2019 WL 2376831, *7, *14 (9th Cir. June 6, 2019) (same, also holding that use of claim form was not overly burdensome where defendant lacked complete information to determine identities of all class members and observing that merely raising specter of collusion without evidence is insufficient to support burden of an objection);

- *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966-67 (9th Cir. 2009); (Where there is a risk of maintaining class action status throughout the trial, this factor favors approving settlement and observing that "parties represented by

competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation").

- *Carter v. City of Los Angeles*, 224 Cal. App. 4th 808 (2014) (approving Unruh Act class settlement which provided only injunctive relief and no monetary recovery);

- *Lane v. Facebook, Inc.*, 696 F.3d 811, 821–23 (9th Cir. 2012) ("[T]he district court properly declined to undermine [the parties'] negotiations by second-guessing the parties' decision as part of its fairness review over the settlement agreement");

- *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) ("settlement class actions present unique due process concerns for absent class members, and the district court has a fiduciary duty to look after the interests of those absent class members");

- *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990) (objectors bear burden of proving any assertions raised challenging reasonableness of a settlement.)

The Court correctly started by reviewing the record and analyzed all Rule 23 certification factors, finding evidence upon which the Court could grant certification under the context of settlement. The Court then observed the split in authority on

merits, procedural risk, and other risk factors, as well as the declarations of counsel and the mediator, and found zero evidence of a collusive settlement, strong evidence that the form and amount of class benefits were fair under the circumstances and satisfied all criteria of Rule 23(e). The Court correctly deferred some level of judgment to Class Counsel, given the fact that they had served as class counsel on over 60 certified class actions. However, an independent justification and analysis followed on all issues.

The District Court found no evidence whatsoever to support any of the positions of the Objectors. It found zero evidence of a collusive reverse auction and noted an abundance of evidence that supported the opposite conclusion. It found no evidence to support Objectors' argument that Super Likes were not of considerable cash-equivalent value. It found no evidence that Class Members were placed on unequal footing or that the injunction did not provide value. It found the characterization of the Settlement as reversionary to be erroneous and noted that the majority of benefits were guaranteed. It made numerous observations about the serious risks to litigation (including procedural risks[12] and merits risks[13]) that

---

[12] *O'Connor v. Uber Technologies, Inc.*, 904 F.3d 1087 (9th Cir. 2018) (risk to class certification of arbitration agreements)

[13] Taking note of the split in California appellate authority between two cases - *Candelore v. Tinder, Inc.*, 19 Cal. App. 5th 1138 (2018) (holding that the plaintiff's allegations based on Tinder's age based price discounts state a claim for age discrimination in violation of the Unruh Act); and *Javorsky v. Western Athletic*

Objectors were ignoring or otherwise discounting without basis. It held the Objectors should be viewed with great skepticism based on their history, as well as the fact that they appeared to have only purchased Tinder services for the purpose of bringing litigation. The Court stopped short of finding the objections frivolous, but the Order demonstrates a strong finding that the objections, while perhaps not frivolous, were largely baseless.

The District Court separately analyzed Kim's Motion for Attorneys' Fees and found the request reasonable. The Court reviewed itemized time records and found that the hours and rates billed were reasonable. The Court cited to the appropriate Ninth Circuit authority, which holds that courts can use either the percentage of the fund or lodestar method of determining whether fees are reasonable, and the Court did both, conducting a lodestar cross check. The Court found that a $1.2 million fee represented 5% of the benefits negotiated for the Class (much lower than the 25% benchmark) and conducted a cross check on the hours of counsel observing that a 1.53 multiplier in a complex class action was reasonable and well within Ninth

_____

*Clubs, Inc.*, 242 Cal. App. 4th 1386 (2015) (affirming trial court and holding that age-based price discount at health club did not violate Unruh Act or UCL). The District Court cited to numerous other cases supporting the *Javorsky* ruling and observed that there were no cases where a judgment was awarded to a plaintiff in an age-based price discrimination context, but several cases where the opposite was true.

Circuit guidance.  Given that fees were negotiated after Class benefits were fully negotiated, the Court found no evidence of collusion and granted the fee requested.

There is nothing particularly revolutionary about the Order.  The only extraordinary detail about the proceedings was the glaring lack of evidence cited by Objectors to support their positions.  The Court correctly pointed out that speculation was not a valid basis to object.

## SUMMARY OF ARGUMENT

Plaintiff/Appellee hereby opposes Objectors' Opening Brief, and requests the Ninth Circuit affirm the District Court's Order Granting Final Approval of the class action settlement and entering Judgment for the Class.

This case involves neither any novel issues of law, nor any extraordinary facts. A favorable settlement was negotiated at arms-length with the assistance of a highly respected mediator, after an exchange of discovery regarding all pertinent facts, with counsel who filed the first action on this theory of liability.  Such negotiations took place in good faith and at arm's length, and there is zero evidence of collusion between Kim and Defendant Tinder Inc. ("Tinder").  The District Court, within its discretion, determined that the terms of the settlement were fair and reasonable in light of the considerable risks to the case.  Objectors[14] opposed the settlement

_____

[14] Objectors are close friends and colleagues of their counsel Alfred Rava and of Allen Candelore, a plaintiff in a competing class action represented by the same

because their counsel was litigating a competing class action *with a completely different named plaintiff* (Allen Candelore) and refused to work with Class Counsel. The Court agreed with the Parties' assessment and held the Objectors' motives were "suspect" and "should be viewed with skepticism" for a host of reasons that are described in the record. Objectors appealed. Their motives remain equally "suspect" and likewise "should be viewed with skepticism" by this Court.

Objectors raise a host of questionable justifications for their Appeal, none of which are particularly persuasive, and many of which are simply unsubstantiated. First, they incorrectly argue that the District Court erred by failing to apply heightened standards of pre-certification approval. This is simply incorrect. The District Court was presented with three objection briefs from Objectors (one premature, and one unauthorized) and, as stated at the hearing, "read everything" and considered all arguments of Objectors but found zero evidence of collusion between the Parties.[15] This was especially true in light of the mediator providing a

---

attorneys. Mr. Candelore filed a quasi-objection at preliminary approval and then opted out of the settlement. His two friends, who appear to have only purchased Tinder services for the purpose of filing a lawsuit, brought objections that mirrored the quasi objection of Mr. Candelore.

[15] Objectors use the term "reverse auction" to describe this settlement, but the District Court expressly found that the facts do not support such a conclusion. This case is similar in several respects to *In re Hyundai and Kia Fuel Economy Litigation*, 926 F.3d 539 (9th Cir. 2019), where the "specter" of a reverse auction, without more, was disregarded as an illegitimate basis to reverse approval of a settlement.

declaration regarding the arms-length nature of negotiations, and fairness of the settlement. The District Court concluded that Objectors' position was unsupported by evidence, which it was, because there is no such evidence. The correct Rule 23 standards were followed, as was applicable precedent on all pertinent issues.

Objectors argue the amount of attorneys' fees awarded was disproportionate to the settlement value. This is not only unsupported factually, but is legally unsound, as the fees are justifiable both under the percentage of the fund, and lodestar methods. The amount of fees ($1.2 million) when compared to the settlement value of $24 million[16] is abundantly reasonable and represents only a 1.53 multiplier on counsels' lodestar.[17] The Court found this reasonable. Fees were negotiated separately from Class Members' recovery and not even discussed until after the Parties *fully negotiated* all Class benefits. This was confirmed by the mediator and counsel in unrefuted declarations. The Ninth Circuit has blessed this chronology as a foundation upon which a court can conclude as to a lack of collusion.

As Objectors point out, not all Class Benefits are guaranteed, but unless this Court is prepared to find that such a settlement can never be subject to final approval,

---

[16] Even with a low take rate, there is over $18 million in guaranteed benefit provided to the Class. Fees are reasonable under the percentage of the fund method and supported by a lodestar cross check with a modest multiplier. Objectors' strawman argument of comparing fees against *only* the monetary payout fails to look at the settlement as a whole.

[17] This Court upheld a larger multiplier in *In re Hyundai*.

this alone is not a basis to reverse. The Ninth Circuit declined to do so in *In re Hyundai* and should do so here. Even so, the majority of settlement terms are guaranteed, including both credits to every single class members' account[18] (which the unrebutted record shows are as good as cash) and strong injunctive relief correcting the behavior that served as the basis of litigation. These terms benefit all Class Members and make up three quarters of the settlement's benefits. To characterize this settlement as reversionary is simply inaccurate.

Objectors take the position that there is no risk in this case. This is wrong. Such a position ignores a split in authority between California appellate courts on the merits of the underlying claim, as well as another summary judgment decision where Objectors' own counsel lost in a similar age-based price discrimination case. It further ignores that irrespective of that split, the only authority supporting the merits of this claim are an appellate decision overturning a motion to dismiss and that the claims also have to withstand summary judgment. Moreover, the claims would have to successfully achieve certification status. After that, the Parties would face an uncertain trial and inevitable appeals on unsettled legal questions, which would likely go to the California Supreme Court as a result of the appellate split.

---

[18] This is referred to as a "universal participation component" because it automatically will be deposited into Class Members' Tinder accounts whether or not they filled out claims forms.

Discovery revealed that 95% of class members signed arbitration agreements (which were being challenged in Kim's first appeal when the settlement was negotiated). Absent a victory on that appeal, 95% of Class Members would have received nothing unless they brought individual cases, which was an option still available to them under the terms of the settlement agreement had anyone except a handful of already-represented consumers done so.[19] As this Court has held, arbitration agreements can serve as a basis for decertification, and are a substantial procedural risk. Objectors ask this Court to ignore that risk and determine that only a settlement which gives full value to every class member's claims should be upheld. This is unrealistic and puts this Court in the position of acting as an armchair district court. Instead, Objectors have the high burden of showing Judge Walter abused his discretion in determining that these risks were substantial and the terms of the Settlement were reasonable in light thereof, where the risks indeed *are* substantial, and the Settlement *is* reasonable. Objectors cannot meet this burden, so they resort to rewriting the annals of this litigation to exclude facts that undermine their position. The fact remains that this is a novel, risky, and messy case to litigate to finality.

---

[19] Ultimately, only .00083% of Class Members opted out of the settlement. <u>All but two opt outs</u> were represented by objectors' counsel, who clearly opted out on the advice of counsel to preserve the right to seek fees and costs under the Unruh Act's a fee-shifting provision. Two opt outs weighed against 240,000 participants demonstrates a high level of satisfaction.

Objectors' arguments regarding due process and adequacy are strained. Kim suffered the exact same alleged injury of discrimination based on age as every other Class Member, and because statutory damages do not depend, from a merits or damages perspective, on the variation of services purchased, Kim has standing to represent a broad class across related and substantively identical products sold under identical discriminatory pricing schemes. Given that the statute of limitations and enforcement of arbitration are affirmative defenses, Tinder has every right to waive such defenses as to whatever group of consumers it chooses in negotiating a class action settlement, so long as the terms of the settlement are fair and reasonable to the Class. There is no due process concern. Treating class members differently under the settlement would violate Rule 23(e) which requires parity in benefits issued to similarly situated class members.

Finally, Objectors' suggestion that Class Counsel did not vigorously prosecute the case is simply false. All pertinent discovery was exchanged, including confirmatory discovery under penalty of perjury. Objectors ask this Court to *assume* inadequacy against the judgment of the District Court and in the absence of evidence to support such a conclusion.

Ultimately, the District Court's ruling is sound as it is legally and factually supported by the record and based upon the correct legal standards. There is no evidence to support the wild conclusions that Objectors would have this Court draw.

Unless this Court is prepared to wade into uncharted territory, such as by banning any Settlement that is not a common fund, holding that all competing class actions (including copycat actions) must always be involved in a settlement (no matter the circumstances) or be deemed collusive regardless of the record showing otherwise, or that class actions that are relatively easy to evaluate as to scope, value and risk must go through years of unnecessary litigation just for the sake of appearances, the District Court's Order should be affirmed.

## ARGUMENT

### I.    STANDARD OF REVIEW

The Ninth Circuit recognizes that there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (*quoting In re Syncor ERISA Litig*., 516 F.3d 1095, 1101 (9th Cir. 2008)).  Recognizing this policy, judicial review is "extremely limited" with respect to a district court's approval of a class action settlement.  *In re Bluetooth Headset Prods. Liab. Litig.,* 654 F.3d 935, 940 (9th Cir. 2011) (quoting *In re Mego Fin. Corp. Sec. Litig*., 213 F.3d 454, 458 (9th Cir. 2000)). Parties seeking to overturn settlement approval must make a "strong showing" that the district court <u>clearly</u> abused its discretion.  *In re Hyundai and Kia Fuel Economy Litigation*, 926 F.3d 539, 556 (9th Cir. 2019); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998).  As long as the district court applied the correct

legal standard to findings that are not clearly erroneous, Ninth Circuit precedent clearly and consistently holds that this Court should affirm. *Id*.; *In re Bluetooth Headset Prods. Liab. Lit*ig., 654 F.3d at 940.

Review is limited to "whether the district court correctly selected and applied Rule 23's criteria." *Parra v. Bashas', Inc*., 536 F.3d 975, 977 (9th Cir. 2008). An award for attorneys' fees, including the method of calculation, is likewise reviewed for abuse of discretion. *In re Online DVD-Rental Antitrust Litig*., 779 F.3d 934, 942 (9th Cir. 2015). Any factual findings underlying either the Rule 23 fairness analysis or the decision on attorneys' fees are reviewed for clear error. *In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d at 940. The possibility that "the settlement could have been better…does not mean the settlement presented was not fair, reasonable or adequate." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).

## II. LEGAL ARGUMENT

Objectors have the heavy burden of making a "strong showing" that the District Court abused its discretion, i.e. that there was either clear error in the analysis or recitation of the facts, or the wrong legal standards were applied. Given that the facts were accurately laid out in the Court's Order, there is no clear error with respect to the factual underpinnings of the ruling. Moreover, the Court did not issue its own brand of justice, but rather simply extensively cited to and quoted a

variety of consistent rulings on class action jurisprudence issued by this Court going back thirty years. The only remaining area of abuse would be if the Court did not follow these standards or abused its discretion in any of its conclusions. Nothing of the sort occurred. Rather, the Court took great effort to consider every argument raised by Objectors, analyze the evidence in support of these arguments, as compared to the evidence and authority in support of the Parties' position, and come to a conclusion that is frankly quite obvious – this was a fair settlement and there are no deficiencies with respect to either the structure or the terms.

Objectors' appeal is baseless and harmful to Class Members by their own admission.[20] It holds up Class Members' entitlement to fair and robust relief negotiated at arms-length and subject to three rounds of highly questionable objections which were clearly motivated by attorney greed and not by genuine concern for the Class. This Appeal should be summarily denied.

## A. The District Court Correctly Applied Heightened Standards of Pre-Certification Approval Under The Proper Rules and Precedent

Objectors' argument that the District Court applied the wrong standard in granting approval of the settlement is difficult to square with the Order itself. The

---

[20] Objectors' position regarding the attrition rate seems to suggest that their goal is, at least in part, to sabotage the settlement.

Court cited Ninth Circuit and Supreme Court precedent and gave specific attention to the "undiluted, even heightened, attention to class certification in the settlement context in order to protect absentees." ER V1 at 44-45, 52, citing *Amchem*, 521 U.S. at 620. The Court "read everything," including even considering the two unauthorized and gratuitous objections motions filed by Objectors, and came to the conclusion that their arguments were based on speculation and amounted to unsubstantiated handwaving.

The District Court analyzed the correct three areas of class settlement approval. First, the Court looked at whether the Rule 23 factors were met. ER V1 at 22-25 citing *Zinser*, 253 F.3d at 1186. The Court conducted a detailed analysis of all factors and found that for purposes of settlement, the Rule 23 certification standards were met.

Next, the Court looked at the Rule 23(e) fairness factors. In doing so, it looked at the discovery conducted, risks to merits and damages, risks to maintaining class certification through trial, and to the arms-length nature of settlement discussions. The very cases cited by Objectors for the proposition that there might be collusion were reviewed. The Order cites to these cases[21] and there was no finding of collusion.

---

[21] *Hanlon v. Chrysler Corp.*, *In re Hyundai, Kia Economy Litigation, and In re Bluetooth.* This Court discussed the obligations of district courts to sniff out collusive and unfair settlements, and the Court cited to all of them and followed their guidance to the letter.

Simply put, the correct legal standards and sound reasoning were applied in analyzing the facts of the case and the substantial risks of litigation.[22] Suggesting otherwise is just plain inaccurate.

Finally, the Court looked at the motion for attorneys' fees and costs and relied on longstanding Ninth Circuit authority to analyze the fee request for three things: 1) did the fee request evidence collusion, 2) were the fees supported by the percentage of the fund method; and 3) were the fees supported by a lodestar cross check? The Court found no evidence of a collusive settlement, specifically pointing to the recent *In re Hyundai* decision where the timing of fees being negotiated with mediator oversight after the class benefits was effectively dispositive of a finding that there could be no collusion over fees. The Court considered the declaration of Judge Meisinger (ret.) (who is incredibly well-respected as a class action mediator) wherein he testified to the fairness of settlement and lack of collusion during negotiations. *See In re Hyundai*, 926 F.3d at 569 (where settlement negotiations are

---

[22] Kim obviously disagrees with many of the defenses and issues raised by Tinder. For instance, Kim believes she will prevail on the merits of her claims, where Tinder believes otherwise. Kim believes her appeal of the arbitration would have been meritorious, whereas Tinder believes their arbitration agreements to be binding and enforceable. Kim believes the class will be certified, whereas Tinder believes there are numerous individualized issues that would bar class certification. However, just because Kim disagrees does not mean she is necessarily correct or that the risks can be ignored. The District Court correctly placed a great deal of emphasis on these risks as a basis for concluding that the Terms were fair.

overseen by a "respected and experienced mediator" there is strong evidence of a lack of collusion).

The Court then observed that under the percentage of the fund method, the settlement amounted to a request of only 5% of the Class benefits and was being paid separately rather than out of Class Members' recovery. The Court then applied the lodestar method and determined a 1.53 multiplier was well within the realm of reasonableness in class action settlements, which regularly grant approval of 2-4 times multipliers.

Objectors' only authority on this topic stems from a misreading of *Roes, 1-2 v. SFBSC Mgmt.*, 944 F.3d 1035 (9th Cir. 2019). Objectors incorrectly cherry pick language from the order and argue that the District Court presumed the fairness of the settlement, when that is expressly not what the Court did. The issue in the cited case was that the court gave complete deference to the opinions of counsel, without analyzing the fairness factors on its own. Had it done so, it would have found that the underlying case was incredibly strong on the merits with very little risk, as there is an avalanche of case law holding as a matter of law that dancers must be classified as employees. The objectors in that case correctly pointed out that the court has an obligation to conduct an independent review and failed to do so. Moreover, there was no universal participation component which provided automatic relief to Class Members. The case was also a wage and hour case alleging extraordinary harmful

wage abuses that caused demonstrable out of pocket harm to low wage workers. There were ill-gotten gains (wages that were effectively stolen from misclassified employees) whereas here there are no ill-gotten gains because the allegation is that a *price discount* being given to customers was discriminatory and triggered statutory penalties.

The fact patterns between *SFBSC* and this action simply do not line up. Judge Walter made his own decisions and while his Order did cite to the experience of Class Counsel as one factor in determining adequacy, it was by no means the predominant reason he granted approval. This is irrefutable from a review of the Order.

Other cases cited by Objectors do not have factual application either. *Allen v. Bedolla*, 787 F.3d 1218 (9th Cir. 2015) merely remanded a settlement for further analysis under Rule 23(3)(2), with no express findings. *Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) is an extreme case with zero application, as the settlement allocated an incredibly disproportionate award to the named plaintiffs and did not treat class members equally or equitably, while simultaneously rubber stamping the requested fees without conducting a fairness analysis. *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071 (9th Cir. 2017) was an injunction only settlement that was deceptively disguised by the parties as a Rule 23(b)(2) settlement, when in actuality it released class members' Rule 23(b)(3) rights for zero consideration. It is one of

the most egregious examples of class action abuse to grace the Ninth Circuit's docket and is not at all equivalent to this action.

To summarize, every applicable Ninth Circuit test for approval was analyzed thoroughly. The District Court came to a different conclusion than the Objectors would have liked, but that does not make the Court's conclusions unfounded nor does it translate into a scenario where the wrong legal standards were applied. Objectors are incorrect. The Order speaks for itself.

### B. The Class Benefits Were Robust, Widespread, Multifaceted and Therefore Fair and Reasonable in Relationship to the Considerable Risks

"The claims, issues, or defenses of a certified class may be settled . . . only with the court's approval." Fed. R. Civ. P. 23 (e). "Adequate notice is critical to court approval of a class settlement under Rule 23(e)." *Hanlon*, 150 F.3d at 1025. Rule 23(e) "requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Id.* at 1026. Courts must balance a number of factors: (1) the strength of the case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel;

(7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *Churchill,* 361 F.3d at 575.

Recent amendments to Rule 23 require the court to consider a similar list of factors, namely, whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2).[23]

---

[23] "Courts have generated lists of factors" to determine the fairness, reasonableness, and adequacy of a settlement, and that "each circuit has developed its own vocabulary for expressing these concerns." Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment. Adding these specific factors to Rule 23(e)(2) was not designed "to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Id.*; *see also United States v. Vonn*, 535 U.S. 55, 64 n.6 (2002) ("[T]he Advisory Committee Notes provide a reliable source of insight into the meaning of a rule . . . ."). Courts should not let "[t]he sheer number of factors . . . distract both the court and the parties from the central concerns that bear on review under Rule 23(e)(2)." *Id.*

This Settlement was the product of thorough, informed arms-length negotiations between experienced class action attorneys familiar with the legal and factual issues of this case who have collectively been approved as adequate class counsel in dozens of cases. Judge Meisinger (ret.), one of the most respected mediators in California, oversaw negotiations and issued a mediator's proposal to resolve the matter. All pertinent information and discovery necessary to fully evaluate the risks to merits and procedural issues was exchanged between the Parties before settlement was negotiated, and verified through confirmatory discovery.

Objectors paint an inaccurate portrait that the terms of the Settlement are somehow manifestly deficient and subject to zero investigation. This characterization is inaccurate and disregards the palpable risks to the Class Members' claims, which Objectors inexplicably assume do not exist at all.

### 1. The Settlement is Fair Compared to Other Unruh Act Class Settlements

Objectors argue that Kim undervalued the settlement, yet ignore that the values given are the result of thorough investigation and thoughtful negotiations among experienced Class Counsel and a highly respected mediator. Kim was able to successfully obtain a considerable and unprecedented Unruh Act settlement. There has never been an Unruh Act settlement that provided relief that was as

widespread or robust as this case. That is to say, there is no precedent for valuing an Unruh Class action in the manner in which Objectors ask this Court to value this case. Kim points to the following cases where approval was granted in an Unruh Act class action:

- *Moralez v. Whole Foods Market, Inc.*, 897 F.Supp.2d 987 (N.D. Cal. Sept. 24, 2012) ($500,000 settlement fund distributed among 32,465 class members - $16 each);

- *Jones v. Wells Fargo Bank, N.A.*, 2015 WL 661757 (Court of Appeal, Second District, Division 7, California Feb. 17, 2015) (affirming Unruh Act class action trial judgment where a jury awarded $3.52 million in damages among 7,348 class members - $479 each);

- *Carter v. City of Los Angeles*, 224 Cal.App.4th 808 (2014) (injunction class settlement under Unruh Act upheld as fair and reasonable, releasing rights of class members to bring claims – no money provided to class);

- *Alfred G. Rava v. Athletics Investment Group, LLC*, Case No. RG 06268693, Superior Court of California County of Alameda (2006). SER V2 299-361. (claims made reversionary settlement with only 19 claims valued at a total of $950 cash plus reversionary discount

coupons, no injunctive relief, $20,000 incentive award for Mr. Rava and $200,000 in legal fees at a 2.0 multiplier).[24]

As demonstrated by these settlements that have been approved by courts, including appellate courts, the Settlement is fair and reasonable.

*Jones* is interesting because the per-person judgment represents a reasonable expectation of a potential verdict on class damages through trial. However, this result assumes the class is certified, the claims survive summary judgment, and the split in authority on age-based price discrimination is decided by the California Supreme Court in favor of Class Members. Those are a lot of risky assumptions, especially given that this case involves undecided questions of law, arbitration agreements for 95% of the Class, and a host of other risks better left for Tinder to lay out in its brief. To find this Judgment should be reversed, this Court would have to rule that the District Court abused its discretion in approving a settlement that provides $100 per person in benefits (in light of these considerable risks) when the ceiling at trial through an appeal is $479. The District Court was *well within its discretion* to agree with the Parties' and Mediator's assessment that the Settlement is fair under the totality of the circumstances.

---

[24] This settlement in particular says all that needs to be said about the motives of Objectors.

## 2. The District Court Correctly Valued the Class Benefits

Much of the Objection comes down to a mischaracterization by Objectors of the benefits offered to the Class, in particular the Universal Participation Component. The record shows that Super Likes are equivalent to cash benefits and in many ways are superior because they can be automatically provided to Class Members by being directly deposited into their accounts without having to file a claim. The record shows that Class Members were paying out of pocket for Super Likes at a rate of more than one per day, at $1 each, which means that in less than six weeks, on average, Class Members would each save $50 in payments that they would otherwise have paid out of pocket to Tinder using the app. Because of the Settlement, keep their money, which is equivalent to depositing $50 in each Class Member's bank account.[25] This is a non-reversionary benefit. Tinder made close to $100 million in revenue in 2018 selling Super Likes. This is decidedly not a coupon. Data in the record, which was subject to discovery, proves the Universal Participation Component is a cash equivalent. This evidence is unrebutted, except by Objectors' *ipse dixit*.

---

[25] These benefits are available to any Class Member who no longer has an active account (free by default). All they have to do is log in. More than half of Class Members have active accounts.

What is ironic about Objectors' position is that they presumably would have no problem if the universal participation component were a $50 check directly deposited into the bank accounts of Class Members. But, as noted above, there was no logistical way to provide such benefits to Class Members due to a lack of identifying information. Tinder did not have bank account information or mailing addresses. This is clear from the record and was subject to discovery. Class Counsel had a choice – attempt to negotiate some form of a common fund where a small percentage of Class Members could make claims, or negotiate a more creative multifaceted structure which benefitted <u>all</u> Class Members regardless of whether they participated. The latter seemed superior as a framework in the judgment of Class Counsel. And yet, Objectors are using that very strength of the Settlement to mischaracterize the benefits as purely reversionary coupons. This is completely wrong.

On top of guaranteed cash equivalents, additional cash benefits were negotiated for the Class. Because of the lack of identifying information, these benefits had to be made available through a claims process.[26] The ultimate take rate

---

[26] There is nothing inherently unfair about a claims process. This Court has numerously upheld such settlements. *Fraley v. Facebook, Inc.*, 2016 WL 145984, at \*1 (9th Cir. Jan. 6, 2016); *Hyundai*, 926 F.3d at 568 (upholding claims made settlement "where less than five percent of the class members file claims."); *Rodriguez*, 563 F.3d at 967; *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 945 (9th Cir. 2015)).

and total cash to be paid out is higher than Objectors assume, because additional notices were sent and the claims period had not yet ended.

Objectors go on to unreasonably discount the value of the public injunctive relief obtained by Kim, which provides a significant value to the Class and is relief that goes to one of the primary purposes of this lawsuit – to prevent Tinder from continuing its alleged illegal practice of further price discrimination based on age. Injunctive relief is part of Fed. R. Civ. P. 23(b)(2), making it a *procedural* remedy available in this case. Additionally, the California Legislature clearly felt this was an important *substantive* remedy for consumers in UCL and Unruh Act litigation. See Cal. Bus. & Prof. Code § 17203 Cal. Civ. Code § 52(c)(3).[27] Moreover, the majority of settlements under the Unruh Act have been primarily geared towards injunctive relief. E.g., *Carter*, 224 Cal.App.4th 808. Objectors' view that this injunction has no value is meritless.[28]

---

[27] "Whenever there is reasonable cause to believe that any person or group of persons is engaged in conduct of resistance to the full enjoyment of any of the rights described in this section…any person aggrieved by the conduct may bring a civil action ... [for] A request for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct, as the complainant deems necessary to ensure the full enjoyment of the rights described in this section." Objectors ask the Court to ignore this part of the statute and pretend this relief is of zero value.

[28] The argument that the settlement allows Tinder to continue to discriminate is wrong. New customers who sign up for Tinder services will be presented with the same price, irrespective of age. Pre-existing customers are contractually entitled to receive services at the advertised price. Objectors' seem to have wanted Class

The District Court allowed Objectors and the Parties to extensively brief issues relating to valuation and based on the evidence in the record, concluded that Kim's valuation was accurate. The District Court held that Objectors' position that Super Likes and injunctive relief carried zero value was unsubstantiated and refuted by the record and that these issues had been subject to adequate levels of discovery and investigation by Kim. That is an abundantly fair assessment of the record which should be upheld by this Court.

### 3. This Case Carried Significant Risk

Objectors' argument regarding risk begins with a false premise – that liability was a total certainty because of a single appellate decision in a sea of contrary authority. *Candelore v. Tinder*, 19.Cal.App.5[th] 1138 (2018), while certainly relevant, is far from dispositive. The case created a split in authority amongst California appellate courts on whether age-based price discrimination could theoretically (assuming evidence supported a finding that it was arbitrary) provide a basis for an Unruh Act claim. Other appellate authority contradicts this holding. *Javorsky v. Western Athletic Clubs, Inc.*, 242 Cal. App. 4th 1386 (2015). Even Objectors' counsel lost summary judgment on this issue. SER V3 511-513.

---

Counsel to force Tinder with a court-ordered injunction to falsely advertise to its customers, who were already under contract. This is patently ridiculous.

The District Court did what district courts are supposed to do – it made a determination as to what the California Supreme Court would likely do with this split. *McQuirk v. Donnelley*, 189 F.3d 793, 797 (9th Cir. 1999). Obviously, Objectors feel differently about the import of *Candelore*, since their counsel were on that case. Reality requires an objective review and *Candelore* was just one case that created a split in authority and merely reversed a motion to dismiss. Getting one's foot in the door on a novel theory of liability is hardly tantamount to winning a classwide judgment for full damages and surviving inevitable appeals to the Supreme Court.

There was a long road ahead. These risks were real. They included risks on merits, certification and damages. They included considerations about arbitration agreements. They were based on a full review of all case law, and all evidence. They were all considered by Class Counsel and by the District Court. These risks support the fairness of the Settlement, and the District Court's findings should be upheld.

## C. The Settlement was not a Reverse Auction

Objectors are overly cavalier in their use of the term "reverse auction," which has a defined meaning, but is often used inappropriately when counsel in a competing class action are displeased that they are not part of a settlement.

An assertion that a reverse auction is afoot requires facts from an objector, not merely the specter of collusion. *Negrete v. Allianz Life Ins. Co. of North America,* 523 F.3d 1091, 1099-1100 (9th Cir. 2008). In *Negrete*, the Ninth Circuit reversed an order preventing settlement negotiations from carrying forward when the objector presented no evidence of collusion between adverse parties. *Id.* A reverse auction is said to occur when "the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir.2002). "It has an odor of mendacity about it." *Negrete* at 1099-1099. "If [Candelore Objectors'] argument were accepted, the 'reverse auction argument would lead to the conclusion that no settlement could ever occur in the circumstances of parallel or multiple class actions—none of the competing cases could settle without being accused by another of participating in a collusive reverse auction.'" *Id.* at 1099-1100 (citing *Rutter & Wilbanks Corp. v. Shell Oil Co*., 314 F.3d 1180, 1189 (10th Cir.2002)).

More recently, in an *en banc* decision, this Court upheld a settlement that was portrayed as a reverse auction by objectors. *In re Hyundai*, 926 F.3d 539 (9th Cir. 2019). Because this decision is so recent and so thoroughly analyzes the criteria for reviewing the criteria a reverse auction, it represents the best authority on the topic.

This Court held that the assertion by objectors that class counsel agreed to a "sweetheart deal" was unfounded. *Id*. at 568-72. First, the amount of fees requested by counsel was not disproportionate to the benefits afforded to the class and were negotiated at arms' length after the benefits to class members had been fully negotiated. This chronology was strong evidence of a lack of collusion because it showed counsel put the interests of the class first. *Id*. The Court noted the involvement of a "respected and experienced mediator" who oversaw settlement negotiations, the fact that class counsel were "experienced," and that class members had plenty of opportunities to raise their concerns during several hearings. *Id*.

This Court ultimately came to the conclusion that the objections were not supported by the record, and even though objectors characterized the settlement as a sweetheart deal that involved the defendant shopping around for the lowest bidder, there simply no evidence to support this conclusion. Instead, objectors simply "floated out the specter of a reverse auction, but brought forth no facts to give that eidolon more substance." *Id*. (citing *Negrete,* 523 F.3d at 1099). Moreover, the fees awarded by the court were analyzed and supported both under the lodestar method and percentage of the fund method. Various multipliers were awarded in the same range as the multiplier in this action, and this Court referred to such awards as "modest and in-line with others we have affirmed." *Id*. (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (upholding a lodestar

multiplier of 3.65) *Kelly v. Wengler*, 822 F.3d 1085, 1093, 1105 (9th Cir. 2016) (affirming lodestar multipliers of 2.0 and 1.3)).  The Court also found that the use of multipliers was well within the district court's discretion.  *Id*. (citing *Fox v. Vice*, 563 U.S. 826, 838 (2011) (emphasizing and instructing appellate courts to give "substantial deference" to attorney's fees calculations because "trial courts need not, and indeed should not, become green-eyeshade accountants" and because of "the district court's superior understanding of the litigation")).

The facts of this case are very similar to *In re Hyundai*.  Substantial tangible and multi-faceted benefits of tens of millions of dollars in value were negotiated for the Class.  Before, during, and after mediation, various forms of discovery were conducted on all relevant facts bearing on merits and procedural risks.[29]  Fees were not negotiated or discussed until after Class benefits had been fully negotiated.  Negotiations took place at arms-length with oversight of a respected mediator who is extremely well-versed in class actions and negotiated by Class Counsel who are highly experienced and have been approved numerously as class counsel.  The fees are not disproportionate to the Class Members' recovery and are supported both under the percentage of the fund method and a lodestar cross check with a "modest"

---

[29] Objectors numerously argue that there was no discovery conducted by Kim.  Not only is this untrue, but Objectors fail to identify even one area of factual or legal inquiry which was unaddressed by Class Counsel in the discovery in this case which, had it been subject to further discovery, might have borne a more favorable result.

multiplier.  Moreover, there was no evidence proffered by Objectors to support the conclusion of a reverse auction or collusive settlement, nor was there evidence to support their position regarding the valuation of the settlement benefits.  Thus, Objectors simply "floated out the specter of a reverse auction, but brought forth no facts to give that eidolon more substance."[30]

Objectors' citations to *Bluetooth* are factually inapplicable.  There, the settlement paid the class "zero dollars" and provided attorneys' fees eight times the total amount of the cy pres award with a kicker clause.  *Bluetooth Headset*, 654 F.3d at 938, 947.   There was also no analysis by the district court of the fee petition under either the lodestar or the percentage method and instead it simply rubber stamped the fee request without analysis.  *Id.* at 943.   If Class Counsel negotiated a deal where the Class would recover zero dollars, $24 million in benefits was given to charity, and Tinder agreed to clear sailing of $200 million for fees, that would certainly raise eyebrows, but that is not the structure of this Settlement.  The Class was provided $24 million in benefits, $18 million of which was guaranteed and

---

[30] The only difference between the cases is that there was a clear sailing provision in this case.  However, had there not been, Class Counsel would have sought fees in the amount of $6 million (25% of the fund), which would have been challenged, and ultimately an even higher fee may have been awarded.  Class Counsel's willingness to negotiate a substantially lower fee (one fifth the amount) is not evidence of collusion.  This is especially true given that there is a *mandatory* fee shift under the Unruh act, and Counsel would have *at least* recovered their lodestar.  Such a concession shows restraint.

automatically benefitted every Class Member, and Class Counsel negotiated a modest fee separately in the amount of $1.2 million, which is 1.53 times their lodestar.

Factually, what happened in this case was obviously not a reverse auction. Class Counsel are highly experienced class action litigators. The Law Offices of Todd Friedman has been appointed class counsel in over 60 class actions, close to a dozen of which by contested motion. John Kristensen has worked on numerous significant class actions,[31] being appointed numerously. Class counsel have never been ruled inadequate and could not be considered "the most ineffectual class lawyers." On the other hand, some of Objectors' counsel have a checkered and questionably litigation history[32] of representing the same group of individuals in invidious and vexations litigation.[33]

---

[31] Mr. Kristensen has been appointed as class counsel by contested motion in two cases since the settlement was approved.

[32] This history was extensively discussed in Kim's Reply in support of Final Approval, and the accompanying declaration of Class Counsel. SER V1-3 at 186-576. Suffice it to say there were very serious adequacy concerns about Candelore, the Objectors, and their counsel which supported a view that the objections were improperly motivated.

[33] A reverse auction necessarily implies a defendant is shopping around for the best deal, but Objectors do not provide evidence suggesting Tinder ever conducted settlement discussions with them. It was Class Counsel who first engaged Tinder in the possibility of class resolution. How can there be a reverse auction when only one set of parties were discussing settlement?

Because there is a glaring lack of evidence of a reverse auction or of any collusion at all, an abundance of evidence to the contrary and clear case law from this Court supporting the appropriateness of the District Court's ruling, Objectors' arguments are without merit.

## D. The Settlement Does Not Violate the Due Process Rights of Absent Class Members

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). To satisfy constitutional due process concerns, "absent class members must be afforded adequate representation before entry of a judgment which binds them." *Hanlon*, 150 F.3d at 1020. The fairness considerations as to adequate representation are set forth under F.R.C.P. 23(e). To comport with the requirements of due process, class notice of a settlement which purports to bind absent class members must be "reasonably calculated to reach interested parties." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 335 (N.D. Ga. 1993). The FJC's Judges' Class Action Notice and Claims Process Checklist considers 70-95% reach among class members to be a "high percentage" and reasonable. SER V2 at 362-372.[34] Rule 23(c)(2)(B)

_____

[34] If notice reaches at least 70% of the class members, due process has been satisfied. *Sheikh v. Tesla, Inc.*, Case No. 17-cv-02193-BLF, 2018 WL 5794532 at *4 (N.D.

does not require "actual notice" or that a notice be "actually received." *Silber v. Mabo*n, 18 F. 3d 1449, 1454 (9th Cir. 1994).

Objectors primary due process argument seems to be not with respect to notice, which they concede met the reach requirements, but rather the scope of settlement, specifically inclusion of: 1) Tinder Gold subscribers; 2) 5% of Class Members who arguably did not sign arbitration agreements, and 3) claims going back more than two years from the filing of Kim's complaint. None of these issues raise due process concerns.[35]

The Class consists of "*Every California subscriber to Tinder Plus or Tinder Gold, who at the time of subscribing was at least 29 years old and was charged a higher rate than younger subscribers*" for Class Period of March 2, 2015 through the date the Court granted preliminary approval. Objectors' argument that the scope of the settlement violates due process because it sweeps in claims that extend before the two-year statute of limitation for Kim's Unruh Act claim is based on a false premise. Under California law Courts recognize that the statute of limitation is an

---

Cal. Nov. 2, 2018); *Edwards v. Nat'l Milk Producers Fed'n*, No. 11-CV-04766-JSW, 2017 WL 3623734, at *4 (N.D. Cal. June 26, 2017).

[35] Objectors are scattershot in their arguments relating to due process. They argue a collusive settlement violates due process, inadequate representation violates due process and the relief to class members being insufficient violates due process. Given that these issues are addressed elsewhere and encompassed by Rule 23(e), Kim does not address these arguments here.

affirmative defense held by a defendant. *Norgart v. Upjohn Co.*, 21 Cal.4th 383, 396 (1999); *Dep't of Indus. Relations v. Seaboard Surety Co.*, 50 Cal.App.4th 1501, 1511 (1996); *Minton v. Cavaney*, 56 Cal.2d 576, 581 (1961) (as an affirmative defense, the statute of limitations is waived if not raised by the defendant); *Gailing v. Rose, Klein & Marias*, 43 Cal.App.4th 1570, 1577 (1996) ("The defendant must raise ... [the statute-of-limitations defense] or the plaintiff has every right to collect a full judgment."); *Elec. Equip. Express, Inc. v. Donald H. Seiler & Co.*, 122 Cal. App. 3d 834, 845 (1981) ("the right to assert…the statute of limitations can nevertheless be waived"). There is no authority cited by Objectors to suggest otherwise as this premise is well settled under binding authority.

In the instant matter, Tinder agreed to waive the statute of limitation for purposes of settlement to resolve this matter, as they are entitled to. Kim likewise is free to represent any class of consumers for whom she can satisfy the Rule 23 factors, so long as she does so adequately. Objectors do not cite a single case that disagrees with this premise. Accordingly, their objection on this ground is baseless.

Further, to suggest there are legal differences between those who purchased Plus vs Gold is erroneous. It is the same claim. Tinder was alleged to have discriminated based on the with respect to both Tinder Plus and Gold in exactly the same way, and thus every Class Member has the exact same claim for the exact same damages under the exact same facts. There are no relevant factual or legal

reasons that each set of consumers would be treated differently based on which product they purchased, and Objectors do not cite to any reasons, nor do they provide any authority in support of their position. The objection on this ground is baseless as well.

Finally, Objectors argue that Kim's settlement of Class Members' claims who did not sign arbitration agreements violated due process. This argument undermines federal authority which holds that arbitration is an equivalent alternative method of adjudication as bringing claims in court. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011). Treating Class members who signed arbitration agreements differently from those who did not would violate the requirement of parity between class members. *See* Fed. R. Civ. P. 23(e)(2)(D) ("the proposal treats class members equitably relative to each other.") While it is true that arbitration agreements present a procedural risk to class certification, such does not change the fact that the underlying claims of Class Members need to be treated the same for fairness purposes, as they are substantively identical on the merits. As such, there is no compelling justification for treating Class Members differently than one another, and Objectors point to no authority suggesting doing so would be appropriate.

Ultimately, there is no due process concern here. The scope of the settlement was appropriate and did not overreach. Class Members were provided notice

pursuant to the due process requirements and were free to opt out if they felt otherwise. The fact that only two non-represented Class Members elected to do so is telling. This is not a valid basis for objection.

## E. The District Court Appropriately Analyzed the Reasonableness of the Attorneys' Fees Under both the Lodestar and Percentage of the Fund Methods

The attorneys' fees awarded in this case were appropriately analyzed according to the guidelines this Court has had in place for decades, and the amount of fees awarded falls squarely within the reasonable range of other fee awards that have withstood similar objections. It is well established that courts in this Circuit have discretion to determine attorney's fees in class actions using either the lodestar method or the percentage-of-recovery method. *Hanlon*, 150 F.3d at 1029; *Bluetooth Headset*, 654 F.3d at 942. "The lodestar calculation begins with the multiplication of the number of hours reasonably expended by a reasonable hourly rate." *Hanlon*, 150 F.3d at 1029. The district court may then adjust the resulting figure upward or downward to account for various factors including the quality of the representation, benefit obtained for the class, complexity and novelty of the issues presented, and risk of nonpayment. *Id*. at 1029.

In the percentage method, "the court simply awards attorneys a percentage of the fund sufficient to provide class counsel with a reasonable fee," using 25% as a

benchmark. *Hanlon*, 150 F.3d at 1029. Similar to the lodestar, the 25% benchmark can be adjusted upward or downward, depending on the circumstances. *See Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). When valuing the settlement is difficult or impossible, the lodestar method may prove more convenient, *Hanlon*, 150 F.3d at 1029, but "no presumption in favor of either the percentage or the lodestar method encumbers the district court's discretion to choose one or the other." *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1296 (9th Cir. 1994). "[T]he lodestar method yields a fee that is presumptively [reasonable]." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010).

This Court has held that a 1.55 multiplier is "modest or in-line with others we have affirmed." *In re Hyundai*, 926 F.3d 539, at 572 (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (upholding a lodestar multiplier cross-check showing a multiplier of 3.65); *Kelly v. Wengler*, 822 F.3d 1085, 1093, 1105 (9th Cir. 2016) (affirming lodestar multipliers of 2.0 and 1.3)). District courts have broad discretion to determine the reasonableness of fees and an appropriate multiplier. *Fox v. Vice,* 563 U.S. 826, 838 (2011) (instructing appellate courts to give "substantial deference" to attorney's fees calculations because "trial courts need not, and indeed should not, become green-eyeshade accountants" and because of "the district court's superior understanding of the litigation").

Objectors argue that awarding fees at a 1.53 multiplier which is equivalent to 5% of the class benefits, was an abuse of discretion. This is not a legally sound argument. It is refuted by common sense, by the record, and by an avalanche of Ninth Circuit and Supreme Court jurisprudence. Even if this Court were to place zero value on any aspect of the Settlement except for the Super Likes, the fees would still represent only 10% of the benefits provided to the Class, which is *well below* the Ninth Circuit's established benchmark for assessing the reasonableness of fees. There can be no debate as to Kim being the prevailing party for purposes of assessing fees, because Kim successfully obtained an injunction plus sizable Class Member benefits. The Unruh Act provides for injunctive relief as a substantive remedy. Therefore, Kim is entitled to recover attorneys' fees under a mandatory fee shifting provision in the statute. There is a presumption of reasonableness as to an award of her counsel's lodestar and a "modest" multiplier to that lodestar was well within the discretion of the District Court, especially since a contested fee petition by Kim's counsel would have sought $6 million in fees under the percentage of the fund method. While it could be anticipated that the District Court would have granted something less than that amount, this possibility demonstrates that the amount of fees awarded was well within the discretion of the Court and also shows that Class Counsel put the interests of the Class first, and exercised restraint. Objectors' arguments should be disregarded.

**F. Class Counsel Conducted Appropriate Levels of Discovery and Objectors Point to no Specific Factual Area of Inquiry that was not Investigated**

Objectors' complaint that Class Counsel did not conduct discovery lacks both specificity and a basis in the record. Indeed, Objectors do not and cannot point to a single issue into which Class Counsel did not conduct discovery, which would have, even in theory, borne a more favorable result for Class Members. That is because Class Counsel conducted all relevant discovery. Evaluation of the claims primarily involved three things: 1) investigating the size and composition of the Class; 2) evaluating factual and legal issues relating to a variety of risk factors; and 3) investigation and discovery into methods of structuring any class settlement in a manner where meaningful benefits could be conferred to Class members.

This was not a case where extensive amounts of documents or data were necessary to evaluate scope or risks.[36]

---

[36] For instance, in a wage and hour class action, one would assume class counsel would obtain sampling of payroll and timekeeping records to determine various violation rates. In a TCPA case, one would expect class counsel to obtain the outbound dial list and evaluate the company's dialer manual. In a false advertising case, information about the scope of mislabeled products would need to be exchanged, including sales data. But in this case, the same product was sold in the same allegedly discriminatory fashion to all Class Members and so there did not need to be large amounts of data or documents exchanged.

### G. Kim and Class Counsel Have Adequately Represented the Class

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). "[A]bsent class members must be afforded adequate representation before entry of a judgment which binds them." *Hanlon*, 150 F.3d at 1020. "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.*

Kim and Class Counsel have no conflicts of interest with Class Members. Kim brought the same claims as the rest of the Class, is seeking the same remedy, and there is no evidence of a conflict of interest. Class Counsel have been approved dozens of times by courts as adequate class counsel and are sufficiently well-qualified and experienced in consumer class actions to represent the Class.

Objectors' argument that Kim and Class Counsel are inadequate in fact have no basis whatsoever under the Rule 23 adequacy standards. They cite to no case law and make no argument that either Kim or Class Counsel have any conflict of interest. The only argument raised is the erroneous position that Kim and Class Counsel did not fight vigorously for the Class. Again, this is based on *ipse dixit* not on actual evidence in the record. The record in fact shows that Class Counsel were the first to

formulate and file an Unruh Act claim premised on Tinder's age-based price discrimination over five years ago. Upon being retained by Kim, this action was filed on behalf of *all* Class Members (not just on behalf of a small subset of the Class). Class Counsel litigated on behalf of the Class, including by opposing a motion to compel, pursuing an appeal, engaging Tinder in widescale resolution discussions, engaging in class-wide discovery, and successfully negotiating the largest Unruh Act class action settlement in the history of the statute, which included injunctive relief halting the discriminatory pricing model, provided guaranteed benefits to every Class Member through a Universal Participation Component, provided additional cash benefits to claimants, and did so irrespective of the substantial risks faced by these 240,000 consumers. Class Counsel engaged a highly respectable claims administrator to provide the best notice practicable and reached 85% of Class Members with direct notice. Class Counsel then defended the Settlement vigorously from questionable objections, including through Appeal. Objectors' position is unfounded.

## CONCLUSION

Objectors obviously disagree with the District Court's decision. This is to be expected from any law firm who represents a consumer in a competing class action and is not part of a settlement. This Court has seen many such baseless objections over the years and consistently applied the same standards. Unless there is a clear

abuse of discretion by a district court, such as by applying the wrong legal standards or not conducting a full analysis of the requisite Rule 23(e) requirements, this Court has consistently declined to play armchair district court. There is no reason to deviate from history with respect to this Settlement, which is historic and unprecedented in both scope and relief achieved under the Unruh Act.

A reversal of the District Court's findings is very likely to result in Class Members receiving nothing for all of the reasons upon which Judge Walter based his rulings. With 99.9% of Class Members having expressed no opposition to this Settlement, and the only opposition coming from attorneys who are obviously motivated by personal greed, the ramifications of a reversal are even more dire. Kim and Class Counsel respectfully urge the Court to summarily affirm.

Dated: June 1, 2020          Respectfully submitted,

By:  */s/ Todd M. Friedman*
Todd M. Friedman (SBN 216752)
Adrian R. Bacon (SBN 280332)
**LAW OFFICES OF TODD M. FRIEDMAN, P.C**.

***Attorneys for Appellant Lisa Kim***

**CERTIFICATE OF COMPLIANCE FOR BRIEFS**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, according to the word-processing software used to generate the brief, it contains 13,999 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief additionally complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  June 1, 2020

BY:   /s/ Todd M. Friedman
        Todd M. Friedman, Esq.
        21550 Oxnard St., Ste 780
        Woodland Hills, CA 91367
        Phone: (877) 206-4741
        Fax:  (866) 633-0228
        Email: tfriedman@toddflaw.com

# CERTIFICATE OF SERVICE

I, Todd M. Friedman, certify that on June 1st, 2020, the LISA KIM'S OPPOSITION TO APPELLANT'S OPENING BRIEF was e-filed through the CM/ECF System, registration as a CM/ECF user constitutes consent to electronic service through the Court's transmission facilities. The Court's CM/ECF system sends an email notification of the filing to the parties and counsel of record listed above who are registered with the Court's EMC/ECF system. A copy of the e-filed documents were sent, via the EMC/ECF system:

Donald R. Brown

dbrown@manatt.com

Manatt Phelps and Phillips LLP

11355 West Olympic Boulevard

Los Angeles, CA 90064-1614


Dated: June 1, 2020


BY: _/s/ Todd M. Friedman
Todd M. Friedman, Esq.
21550 Oxnard St., Ste 780
Woodland Hills, CA 91367
Phone: (877) 206-4741
Fax: (866) 633-0228
Email: tfriedman@toddflaw.com