No. 19-55807

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

**LISA KIM, individually and on behalf of
all others similarly situated,**
*Plaintiff-Appellee,*

v.

**RICH ALLISON AND STEVE FRYE,**
*Objectors-Appellants,*

v.

**TINDER, INC., et al.,**
*Defendants-Appellees.*

———————————

On Appeal from the United States District Court
Central District of California No. 2:18-cv-03093-JFW-AS
The Honorable John F. Walter

———————————

## ANSWERING BRIEF OF
## TINDER, INC. ET AL.

———————————

MANATT, PHELPS & PHILLIPS, LLP
Robert H. Platt, Donald R. Brown, Benjamin G. Shatz
2049 Century Park East, Suite 1700
Los Angeles, CA 90067-3119
(310) 312-4000 / Fax (310) 312-4224

*Attorneys for Defendants-Appellees*
Tinder, Inc.; Match Group, LLC; and Match Group, Inc.

# Corporate Disclosure Statement

Tinder, Inc., Match Group, LLC, and Match Group, Inc. identify the following parent corporations and publicly held corporations owning 10% or more of their stock:

- No publicly held corporation owns 10% or more of Tinder, Inc.'s stock.

- Match Group, Inc. is the sole member of Match Group, LLC.

- IAC Group, LLC owns more than 80% of Match Group, Inc.

- IAC/InterActiveCorp wholly owns IAC Group, LLC.

- No publicly held corporation owns 10% or more of IAC/InterActiveCorp's stock.

June 2, 2020

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

By: s/Donald R. Brown
    *Attorneys for Defendants/Appellees*
    Tinder, Inc., et al.

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

FACTUAL AND PROCEDURAL HISTORY ......................................................6

I.      Tinder Is a Popular Free Dating App; Tinder Plus and Tinder Gold
        Are Fee-Based Add-Ons. ...............................................................................6

II.     Discounted Pricing for Tinder Plus and Tinder Gold Was Supported
        by Empirical Data and Permitted Under Established Law. ...........................7

III.    Candelore Sued Tinder and Eventually Survived a Demurrer, but
        Made No Further Progress in His Case. ........................................................8

IV.     Kim Sued Tinder on the Same Theory, and the Parties Negotiated a
        Settlement. ...................................................................................................10

V.      The Class Members Overwhelmingly Endorsed the Settlement. .................12

ARGUMENT.......................................................................................................14

I.      The District Court Approved the Settlement Using the Proper
        Standard of Review......................................................................................14

II.     The District Court Did Not Abuse Its Discretion in Finding the
        Settlement Resulted from a Fair Process. ...................................................17

III.    The District Court Did Not Abuse Its Discretion in Finding the
        Settlement Fair, Reasonable, and Adequate. .............................................21

        A.      The Award of 50 Super Likes to Every Class Member Provides
                Demonstrable Value. .......................................................................22

        B.      The Ability to Claim Additional Benefits Worth $25 or More
                Provides Further Value. ..................................................................24

        C.      No "Monetary Fund" Was Appropriate for a Settlement
                Featuring Automatic Awards, and the Claims Rate for the
                Additional Benefits Was Reasonable. .............................................25

326367475.2

D. The Settlement Treats All Class Members Equitably. .......................26

E. The Settlement Addresses Prospective Pricing Practices...................27

IV. The Settlement Is Fair Given Tinder's Significant Defenses to Liability and Damages. ...................................................................30

A. No Class Member Was Economically Harmed. ................................30

B. Establishing Unruh Act Liability Would Be Difficult. ......................31

C. Tinder Has Substantial Defenses to Liability and Class Certification Under *Candelore* Itself...................................................33

D. Strong Contractual Defenses to Liability and Damages Exist. ..........36

 1. Texas law governs the relationship. ........................................36

 2. The TOU likely prohibits statutory damages...........................38

E. Tinder Has Another Strong Contractual Defense: The Vast Majority of the Settlement Class Is Bound by an Arbitration Agreement and Class Waiver..........................................................40

 1. Tinder users' assent to the TOU, including its arbitration agreement and class action waiver ..........................................41

 2. 95% of the settlement class expressly assented to the TOU........................................................................................42

 3. The arbitration agreement is enforceable................................44

 4. The arbitration agreement renders contested class certification highly improbable. ..............................................45

F. The Constitution Prohibits Disproportionate Statutory Damages. ..........................................................................................48

326367475.2

**TABLE OF CONTENTS**
**(continued)**

V.   Objectors' Remaining Arguments Provide No Basis to Disturb the
     Settlement. ................................................................................................49

CONCLUSION ...................................................................................................50

326367475.2

# TABLE OF AUTHORITIES

## CASES

*Allen v. Bedolla,*
787 F.3d 1218 (9th Cir. 2015).........................................................21

*Arden Carmichael, Inc. v. Cnty. of Sacramento,*
93 Cal. App. 4th 507 (2001)....................................................39, 41

*Armendariz v. Found. Healthcare Psychcare Servs., Inc.,*
24 Cal. 4th 83 (2000) .......................................................................39

*Arthur's Garage, Inc. v. Racal-Chubb Sec. Sys., Inc.,*
997 S.W.2d 803 (Tex. App.—Dallas 1999, no pet.).......................38

*Avilez v. Pinkerton Govt. Sys., Inc.,*
596 F. App'x 579 (9th Cir. 2015)...................................................46

*Bateman v. Am. Multi-Cinema, Inc.,*
623 F.3d 708 (9th Cir. 2010)..........................................................49

*Berman v. Freedom Fin. Network, LLC,*
400 F. Supp. 3d 964 (N.D. Cal. 2019)............................................46

*BMW of N. Am., Inc. v. Gore,*
517 U.S. 559 (1996).........................................................................49

*Bostick v. Herbalife Int'l of Am., Inc.,*
2015 WL 12731932 (C.D. Cal. May 14, 2015) ...............................28

*Brisbane Lodging, L.P. v. Webcor Builders, Inc.,*
216 Cal. App. 4th 1249 (2013)........................................................44

*Campanelli v. Image First Healthcare Laundry Specialists, Inc.,*
2018 WL 6727825 (N.D. Cal. Dec. 21, 2018).................................47

*Campbell v. Facebook, Inc.,*
951 F.3d 1106 (9th Cir. 2020)..................................................16, 17

*Candelore v. Tinder, Inc.,*
19 Cal. App. 5th 1138 (2018)...................................................passim

*Carter v. City of Los Angeles,*
224 Cal. App. 4th 808 (2014)....................................................25, 26

iv

*Cohn v. Corinthian Colleges, Inc.*,
169 Cal. App. 4th 523 (2008).........................................................................31

*Conde v. Open Door Mktg., LLC*,
223 F. Supp. 3d 949 (N.D. Cal. 2017)...........................................................46

*Conde v. Sensa*,
2018 WL 4297056 (S.D. Cal. Sept. 10, 2018)................................................46

*Dean Witter Reynolds, Inc. v. Superior Court*,
211 Cal. App. 3d 758 (1989)..........................................................................47

*DeWitt v. W. Pac. Ry. Co.*,
719 F.2d 1448 (9th Cir. 1983).......................................................................18

*Dyna-Med, Inc. v. Fair Emp't & Hous. Comm'n*,
43 Cal. 3d 1379 (1987) .................................................................................39

*Exxon Mobil Corp. v. Drennen*,
452 S.W.3d 319 (Tex. 2014)....................................................................36, 37

*Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*,
209 Cal. App. 4th 1118 (2012).......................................................................38

*Fox Elec. Co. v. Tone Guard Security, Inc.*,
861 S.W.2d 79 (Tex. App.—Fort Worth 1993, no writ)..................................38

*Fraley v. Facebook, Inc.*,
2016 WL 145984 (9th Cir. Jan. 6, 2016)........................................................24

*Hale v. Morgan*,
22 Cal. 3d 388 (1978) ...................................................................................48

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998)...................................................................4, 21

*Harris v. Bingham McCutchen LLP*,
214 Cal. App. 4th 1399 (2013)........................................................................36

*Harris v. Capital Growth Investors XIV*,
52 Cal. 3d 1142 (1991) .................................................................................31

*In re Anthem, Inc. Data Breach Litig.*,
327 F.R.D. 299 (N.D. Cal. 2018) ...................................................................23

326367475.2

*In re Baby Prods. Antitrust Litig.*,
   708 F.3d 163 (3d Cir. 2013)..............................................................19

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011)........................................................4, 17

*In re Checking Account Overdraft Litig.*,
   780 F.3d 1031 (11th Cir. 2015).......................................................46

*In re Hyundai & Kia Fuel Economy Litig.*,
   926 F.3d 539 (9th Cir. 2019)...................................................passim

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015).........................................................26

*In re Syncor ERISA Litig.*,
   516 F.3d 1095 (9th Cir. 2019).......................................................17

*In re Titanium Dioxide Antitrust Litig.*,
   962 F. Supp. 2d 840 (D. Md. 2013)................................................45

*Iskanian v. CLS Transp. Los Angeles, LLC*,
   59 Cal. 4th 348 (2014) ...................................................................45

*Javorsky v. Western Athletic Clubs, Inc.*,
   242 Cal. App. 4th 1386 (2015)................................................passim

*Kissel v. Code 42 Software, Inc.*,
   2016 WL 7647691 (C.D. Cal. Apr. 14, 2016) .................................37

*Koby v. ARS Nat'l Servs., Inc.*,
   846 F.3d 1071 (9th Cir. 2017)........................................................21

*Koire v. Metro Car Wash*,
   40 Cal. 3d 24 (1985) ......................................................................31

*Lane v. Facebook, Inc.*,
   696 F.3d 811 (9th Cir. 2012)............................................21, 22, 49

*Lazar v. Hertz Corp.*,
   69 Cal. App. 4th 1494 (1999).....................................................8, 33

*Lee v. JPMorgan & Chase Co.*,
   2015 WL 12711659 (C.D. Cal. Apr. 28, 2015) ..............................27

326367475.2

*Lewis v. YouTube, LLC*,
    244 Cal. App. 4th 118 (2015)........................................................38

*Linney v. Cellular Alaska P'ship*,
    151 F.3d 1234 (9th Cir. 1998)....................................................17

*Marina Point, Ltd. v. Wolfson*,
    30 Cal. 3d 721 (1982) ............................................................8, 33

*Markborough Calif., Inc. v. Superior Ct.*,
    227 Cal. App. 3d 705 (1991).....................................................38

*McQuirk v. Donnelley*,
    189 F.3d 793 (9th Cir. 1999).....................................................18

*Moreno v. Sanchez*,
    106 Cal. App. 4th 1415 (2003)..................................................44

*Murphy v. SFBSC Mgmt.*,
    944 F.3d 1035 (9th Cir. 2019)..................... 15, 16, 19, 20

*Nedlloyd Lines B.V. v. Superior Ct.*,
    3 Cal. 4th 459 (1992) ............................................................36, 37

*O'Connor v. Uber Techs., Inc.*,
    904 F.3d 1087 (9th Cir. 2018).....................................................45

*O'Connor v. Vill. Green Owners Ass'n*,
    33 Cal. 3d 790 (1983) ............................................................8, 33

*Pablo v. Servicemaster Global Holdings, Inc.*,
    2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) ..................................46

*Pizarro v. Lamb's Players Theatre*,
    135 Cal. App. 4th 1171 (2006)...........................................8, 32, 36

*Powell v. Wells Fargo Home Mortg.*,
    2016 WL 1718189 (N.D. Cal. Apr. 29, 2016) ................................18

*Reese v. Wal-Mart Stores, Inc.*,
    73 Cal. App. 4th 1225 (1999).....................................................47

*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009)................................................15, 24

# TABLE OF AUTHORITIES
## (continued)

*Salgado v. Carrows Restaurants, Inc.*,
33 Cal. App. 5th 356 (2019)............................................................42

*Sargoy v. Resolution Trust Corp.*,
8 Cal. App. 4th 1039 (1992).....................................................8, 31

*Shames v. Hertz Corp.*,
2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) ..................................25

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
904 F.2d 1301 (9th Cir. 1990)........................................................48

*Slakey Bros. Sacramento v. Parker*,
265 Cal. App. 2d 204 (1968)..........................................................47

*St. Louis, I.M. & S. Ry. Co. v. Williams*,
251 U.S. 63 (1919)..........................................................................48

*Starkman v. Mann Theatres*,
227 Cal. App. 3d 1491 (1991)....................................................8, 32

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003).........................................................21

*Stier v. Reading & Bates Corp.*,
992 S.W.2d 423 (Tex. 1999).........................................................37

*Tan v. Grubhub, Inc.*,
2016 WL 4721439 (N.D. Cal. July 19, 2016)..................................45

*Trudeau v. Google LLC*,
349 F. Supp. 3d 869 (N.D. Cal. 2018).............................................42

*Vergara v. California*,
246 Cal. 4th 619 (2016) ...................................................................9

*Walnut Creek Manor v. Fair Emp't & Hous.*,
54 Cal. 3d 245 (1991) ...................................................................48

*Williamson v. McAfee, Inc.*,
2016 WL 4524307 (N.D. Cal. Aug. 30, 2016) ...............................28

*Zalkind v. Ceradyne, Inc.*,
194 Cal. App. 4th 1010 (2011).......................................................44

326367475.2

# TABLE OF AUTHORITIES
## (continued)

## STATUTES

California's Unruh Civil Rights Act.................................................................passim

Civil Code § 52........................................................................................39

Civil Code § 52(i).....................................................................................39

Civil Code § 52(a) ...................................................................................39

Federal Arbitration Act ............................................................................45

Patient Protection and Affordable Care Act, 42 U.S.C. §§ 18001 *et seq.* (2010) .............................................................................................35

Unfair Competition Law ...............................................................1, 8, 10, 33

## OTHER AUTHORITIES

Assemb. Con. Res. No. 53, Assemb. Sess. 2017-18 (Cal. 2017) ...........................35

CACI No. 3060.......................................................................................30

Rest. (Second) Conflict of Laws § 187, subd. (2)...........................................37

## RULES

Federal Rule of Civil Procedure 23 .............................................................47

Federal Rule of Civil Procedure 23(e)(2) ...............................................passim

# INTRODUCTION

The district court properly granted final approval of the parties' class action settlement after diligently applying Federal Rule of Civil Procedure 23(e)(2) and this Court's precedent. Plaintiff Lisa Kim contends that Tinder[1] violated California's Unruh Civil Rights Act and Unfair Competition Law by offering a discount on two premium services—Tinder Plus and Tinder Gold—to under-29 users of its dating app. Tinder believes that this good-faith price discount was well within the bounds of the law. Nonetheless, after arm's-length negotiations overseen by a distinguished mediator, Kim and Tinder reached an agreement that provides each of the 240,000 settlement class members with automatic awards worth $50 and the right to claim an additional $25 in cash or other benefits, and requires Tinder to implement uniform pricing in California—a settlement valued at $24 million.

The settlement was well received, drawing no independent objections and only two independent opt-outs. The only objections were filed by self-interested lawyers—including counsel pursuing a competing state court lawsuit against Tinder based on the same theory. The plaintiff there, Allan Candelore, and the objector-appellants, Rich Allison and Steve Frye ("Objectors"), share counsel and a history with the same "men's rights" organization. Hoping to salvage the class leverage of Candelore's lawsuit, Objectors (who could simply have opted out and pursued their own individual claims) vigorously opposed the settlement, asserting the same

---

[1] In 2017, Tinder, Inc.'s assets and liabilities were acquired by Match Group, LLC, which itself is owned by Match Group, Inc. [ER-365] This brief refers generally to "Tinder" for simplicity.

arguments now advanced on appeal. The district court considered and rejected those challenges in a detailed order [ER-18-35] that applied all of the Rule 23(e)(2) factors for evaluating a pre-class-certification settlement.[2]

Objectors predictably paint the settlement as a "sweetheart deal" that benefits the parties at class expense, invoking dissimilar settlement attempts in other cases where the key features here were absent: significant *automatic* benefits to the entire class, as well as optional additional benefits that include meaningful cash awards. Objectors cite no case—and Tinder is aware of none—deeming a similarly structured settlement inadequate.

One of Objectors' main themes depends upon a mischaracterization of the *Candelore* case status at the time of the *Kim* settlement; they somehow equate surviving a demurrer with prevailing on the merits. In fact, Candelore merely obtained (on appeal) a ruling that he had *stated a claim*—the first step on a long, uncertain road to obtaining class certification and establishing class-wide liability. *See Candelore v. Tinder, Inc.*, 19 Cal. App. 5th 1138 (2018). Following remittitur to the trial court, the only development in *Candelore* was a Tinder document production. These documents were also shared with Kim's counsel, enabling evaluation of settlement on equal informational footing.

Objectors also float a wildly inflated assessment of potential class damages to suggest that the settlement was substantively anemic. Objectors assume victory on

---

[2] The other four objections were filed by a single law firm on behalf of individuals who had filed unsuccessful arbitration claims against Tinder. That firm also served opt-outs on behalf of 235 clients to preserve pending arbitration claims.

every issue through judgment—that certification would be granted and that all 240,000 class members would recover at least $4,000 in statutory damages under the Unruh Act, for a total of at least $960 million. Little is required to puncture this bloated trial balloon. Of course, class settlements rarely if ever reflect maximum upside scenarios; most resolve at small fractions of potential exposure because of the significant impediments to obtaining class judgments. Similar hurdles abound here and informed the settling parties' assessments. For example, 95% of the settlement class entered into arbitration agreements with class waivers, and some portion of the remaining 5% is similarly bound, necessitating class-defeating individual inquiries. The user agreements also specify Texas law, which renders the Unruh Act inapplicable, and include a liability limitation provision that likely precludes statutory damages—to say nothing of the fact that imposition of liability on the order of $1 billion for no or negligible actual harm could not withstand constitutional scrutiny.

Kim (and any other putative plaintiff, including Candelore) would also face other obstacles to establishing liability and damages, both individually and class-wide. For example, Tinder's pricing model does not appear to have actually harmed anyone in the class, because those subscribers would have paid the same price even had younger subscribers not been given a discount. Objectors cite no case, and none exists, where damages have been awarded under the Unruh Act to someone who did not qualify for an age-based discount. Indeed, as a result of the settlement, Tinder

3

has simply ended the discount policy for new, younger subscribers—class members have experienced no price change.[3]

In light of the many factual, legal, and practical obstacles to success (particularly on the grandiose scale Objectors imagine), the class settlement approved by the district court represents a generous outcome for this dubious litigation, and certainly a fair one. That Objectors would prefer a different settlement (as they always do) does not mean that the district court applied the wrong legal standard or abused its discretion in approving this one. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 940 (9th Cir. 2011) (review of court's exercise of discretion in approving class settlement is "extremely limited" and its decision is subject to reversal only for a "clear abuse of discretion"); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) (possibility that "the settlement could have been better . . . does not mean the settlement presented was not fair, reasonable or adequate").

The structure of the settlement is also fair and reasonable. Objectors complain it did not establish a "monetary fund," which is but one way to offer valuable compensation. It is well recognized that all-cash settlements often can be consummated only at substantially *lower* levels of overall relief. Here, the settlement provides advantageous *automatic* benefits, which Objectors cannot meaningfully contest have an objectively measurable value of $12 million. An

---

[3] An unfortunate result of these Unruh Act claims having been asserted is thus that young adults in California are now deprived of discounts that are still enjoyed by their counterparts in the rest of the country.

additional $6 million in benefits, including cash and other options, could be claimed through a simple process. Although Objectors disparage the claims rate for the additional benefits, claims rates for a secondary component have less import where the main benefits are automatically conferred. And if the claims rate here is modest, it likely reflects the low value class members place on the supposed "injury" of paying the same non-discounted subscription rate they have always paid.

Nor is there any substance to Objectors' contention that the settlement allows Tinder to continue to discriminate. In February 2019, pursuant to the settlement, Tinder began charging the former 29-and-over price to all new Tinder Plus and Tinder Gold subscribers in California regardless of age. Objectors complain that subscribers who were already paying the discount price in February 2019 may continue paying that price until their subscriptions expire. But that contractually mandated price is lower than the price paid by *all* new subscribers after February 2019—regardless of age—and therefore is non-discriminatory on that basis.

While a handful of subscribers have filed lawsuits against Tinder in the five years since Tinder Plus was released, the vast majority—who are now settlement class members—have never complained about what they received or how much they paid for it, are content to accept this windfall settlement, and should not be deprived of its benefits by Objectors' counsel's quest for a payday in their own, duplicative class action. This Court should affirm the district court's approval of the settlement.

# FACTUAL AND PROCEDURAL HISTORY

## I.  Tinder Is a Popular Free Dating App; Tinder Plus and Tinder Gold Are Fee-Based Add-Ons.

Tinder released its eponymous, free dating app in 2012. After a user downloads the app onto a smartphone and creates a profile, the app, using the phone's GPS technology, displays profiles of other Tinder users in the same locale who meet the user's stated criteria. If two users view each other's profile and indicate mutual interest by sliding right on their smartphone screens (using the SWIPE RIGHT feature), they can communicate directly through the app. If either user slides left instead—indicating lack of interest—communication through the app is not available. [ER-365; 1-SER-7]

In 2015, as a complement to its free service, Tinder began offering Tinder Plus, a suite of options available for a fee. [3-SER-578] The benefits consist of unlimited use of the SWIPE RIGHT feature (which is otherwise limited on a per-12-hour basis), elimination of in-app advertisements, the ability to "rewind" (or take back) a decision to pass on a profile, the ability to see profiles of people in other cities, and a higher allotment of "Super Likes" (a popular means of indicating heightened interest in another user). [1-SER-8-9, 586; ER-217]

In 2017, Tinder began offering another suite of premium services called Tinder Gold, which contains all features of Tinder Plus as well as others. The free Tinder app remains fully and independently functional for users, with no need to subscribe to Plus or Gold. [3-SER-578]

6

The Tinder app and its Plus or Gold features are typically downloaded through the Apple App Store for Apple devices or the Google Play Store for Android devices. [ER-218]  Subscription fees for Tinder Plus or Tinder Gold are charged through the user's Apple or Google account.  [ER-218]

When Tinder first released Tinder Plus in the U.S. in March 2015, subscribers under age 30 received a discounted price.  In March 2016, the age cutoff for the discount was lowered to 29.  [3-SER-578]  That discount—which applies to both Tinder Plus and Tinder Gold—remains in place today except in California, where, on account of this lawsuit, Tinder stopped offering youth discounts for new subscriptions in February 2019 and began charging all new subscribers the same price that formerly applied only to subscribers age 29 and above.  [3-SER-578-79] During the time the youth discount was offered in California, the standard price for Tinder Plus was $19.99 for a monthly subscription, and the youth discount price was typically $9.99.  For Tinder Gold, the respective prices were $29.99 and $14.99.  [1-SER-9]

## II.  Discounted Pricing for Tinder Plus and Tinder Gold Was Supported by Empirical Data and Permitted Under Established Law.

Before releasing Tinder Plus, Tinder conducted market research and price testing to gauge users' willingness to pay for a Plus subscription.  This research indicated, unsurprisingly, that younger users were generally unwilling to pay as much as older users, because they generally have lower incomes.  [1-SER-9]

When Tinder released Tinder Plus in 2015, no court in the nation had ever held age-tiered consumer pricing unlawful.  In California, courts had repeatedly

326367475.2

upheld age-based discounts when offered to encourage participation in social activities by certain age groups, including those considered to have comparatively fewer financial resources. *See*, *e.g.*, *Pizarro v. Lamb's Players Theatre*, 135 Cal. App. 4th 1171 (2006) ("baby boomer" discount for theater tickets permissible); *Starkman v. Mann Theatres*, 227 Cal. App. 3d 1491 (1991) (age-based discounts for movie tickets permissible). Courts had also approved other forms of age-based benefits or surcharges. *See*, *e.g.*, *Sargoy v. Resolution Trust Corp.*, 8 Cal. App. 4th 1039 (1992) (reduced interest rates for senior citizens permissible); *Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494 (1999) (higher car-rental fees for younger drivers permissible). In fact, the only age-based distinctions ever held to violate the Unruh Act involved the outright *exclusion* of certain age groups from any *access* to housing, a basic necessity of life—a situation bearing no resemblance to a modest discount for add-on features of a dating app. *See Marina Point, Ltd. v. Wolfson*, 30 Cal. 3d 721 (1982); *O'Connor v. Vill. Green Owners Ass'n*, 33 Cal. 3d 790 (1983).

## III. Candelore Sued Tinder and Eventually Survived a Demurrer, but Made No Further Progress in His Case.

In May 2015, shortly after Tinder Plus was released in the U.S., Plus subscriber Allan Candelore sued Tinder in Los Angeles County Superior Court on behalf of a putative state class of subscribers, claiming age-tiered pricing for Tinder Plus violated the state's Unruh Act and Unfair Competition Law ("UCL"). In October 2015, the trial court sustained Tinder's demurrer to Candelore's complaint without leave to amend. [Tinder's Request for Judicial Notice ("RJN"), Ex. 1, p. 13] In December 2015, the First Appellate District specifically endorsed the legality of

under-30 discounts, holding such a discount for gym memberships was not arbitrary or invidious and was therefore lawful. *See Javorsky v. Western Athletic Clubs, Inc.*, 242 Cal. App. 4th 1386 (2015). Thus, Tinder continued to possess a good-faith basis, grounded in empirical data and legal authority, to offer a youth discount for Tinder Plus, and for Tinder Gold when that feature set was released in 2017.

No California court had ever questioned the validity of age-based pricing until January 2018, when the Second Appellate District reversed the trial court's ruling and revived the *Candelore* complaint. In so doing, the court rejected the long-standing judicial test for age-based pricing, recently affirmed in *Javorsky*, in favor of a new test that would invalidate an age-based discount policy unless either (1) the justification for the policy applied to every single member of the group receiving the discount (such that, here, every Tinder Plus or Gold subscriber receiving the price discount would have to have less income than every subscriber not receiving the discount), or (2) the policy applied only to an age group identified in legislative enactments as warranting special treatment—with the second condition effectively a safe harbor for previously approved children's and senior citizens' discounts, which could not satisfy the first condition. *See Candelore*, 19 Cal. App. 5th at 1148-50.[4]

---

[4] Tinder sought review of this decision by the California Supreme Court in light of the conflict between the First (*Javorsky*) and Second (*Candelore*) Appellate Districts, but review was denied in May 2018. That denial of course cannot be construed even as implicit endorsement of the Court of Appeal's opinion. *See Vergara v. California*, 246 Cal. 4th 619, 652 (2016) (order denying review "does not reflect the views of the justices voting to deny review concerning the merits of the

The *Candelore* decision was poorly reasoned and out of step with California law (as the district court here observed), and its only practical consequence was to allow Candelore's claim to proceed past the pleading stage. That claim still was subject to proof at trial, and faced various intermediate hurdles. And if his case were further litigated, that decision would likely turn out to be a Pyrrhic victory for Candelore, because the appellate court's rationale militates against both class certification and class-wide liability, for reasons discussed later below. In any event, little beyond an initial Tinder document production has occurred in *Candelore* since the case was returned to the trial court.

## IV. Kim Sued Tinder on the Same Theory, and the Parties Negotiated a Settlement.

In April 2018, before *Candelore* returned to the trial court, Lisa Kim filed a putative class action against Tinder in federal district court, claiming, like Candelore, that Tinder's youth discount for Tinder Plus violated the Unruh Act and the UCL. [ER-373; 1-SER-3] Citing the arbitration agreement and class waiver in its Terms of Use ("TOU"), Tinder moved to compel arbitration. The district court granted Tinder's motion, and Kim appealed.[5] [ER-334-41; 1-SER-21]

---

decision below" but rather "represents only a determination that, for whatever reason, a grant of review is not appropriate at the time of the order").

[5] Unlike Kim, Candelore created his Tinder account before Tinder had implemented the binding method of TOU assent known as "sign-in wrap" or "browsewrap resembling clickwrap." [*Compare* ER-161, 3-SER-580] Tinder has thus far refrained from asserting the arbitration agreement against Candelore, because determining whether he was bound by the TOU's arbitration provision would require a threshold factual determination of whether he had knowledge of the TOU when creating his account.

While that appeal was pending, Kim suggested class-wide settlement discussions, and the parties later agreed to extend the appeal schedule. [1-SER-153-54; 3-SER-608-09; Dkt. 6-8] The *Candelore* case, in the meantime, lay dormant. [RJN, Ex. 1, pp. 7-8] When discovery eventually started in that case, Tinder produced documents to Candelore's counsel and then shared them with Kim's counsel to facilitate settlement discussions.[6] [1-SER-154; ER-180]

Tinder and Kim mediated before retired Superior Court Judge Louis Meisinger in November 2018. After a full-day session and follow-on negotiations under Judge Meisinger's oversight, the parties reached a settlement, which was memorialized in a written agreement at the end of 2018. [1-SER-154, 184; ER-283] The settlement provides the following benefits to California subscribers to Tinder Plus or Tinder Gold who were at least age 29 when they subscribed and were charged a higher price than younger subscribers:

- Tinder will automatically deposit 50 Super Likes into every class member's account. As noted above, Super Likes, a popular feature of the Tinder app, are used to express heightened interest in another user and can be purchased à la carte for $1 each.

- Every class member could choose one of three *additional* benefits by submitting a claim form: (i) $25 in cash, (ii) 25 additional Super Likes, or

---

[6] Objectors contend that the parties in *Candelore* also engaged in "class certification-related discovery." (AOB 13, citing ER 170.) The cited document makes no reference to class discovery. Furthermore, the case has long been stayed pending the outcome of this appeal. [RJN, Ex. 1, pp. 8-9]

(iii) a month's subscription to Tinder Plus ($19.99 value) or Tinder Gold ($29.99 value).

- Tinder agreed to halt age-tiered pricing in California for new subscribers, subject to certain contingencies, such as legislation or case law that would further support the permissibility of age-based discounts. [ER-288-90]

## V. The Class Members Overwhelmingly Endorsed the Settlement.

After the district court granted preliminary approval of the settlement, notice was emailed to the vast majority of the 240,000 settlement class members. [ER-66-67; 1-SER-164] With three exceptions (one being Candelore himself), the only opt-outs were submitted by a single law firm, Davis & Norris, on behalf of clients pursuing individual arbitration cases against Tinder on the same legal theory. [2-SER-226; 3-SER-607-08] Davis & Norris submitted 235 opt-outs (49 of which were on behalf of *non*-class members who had never subscribed to Tinder Plus or Tinder Gold in California at the higher price). [3-SER-607-08, 633]

Not a single independent objection was filed. The only objections were filed by Davis & Norris (on behalf of four unsuccessful arbitration claimants),[7] and by counsel in *Candelore* on behalf of the two Objectors here, Rich Allison and Steve Frye. [1-SER-164-65; 3-SER-582-87, 607] Allison and Frye are friends of Candelore, and all three are longtime clients of Objectors' counsel, Al Rava. [2-SER-219-24] The group has collaborated on a number of Unruh Act cases involving

---

[7] The objections filed by Davis & Norris were deficient for various reasons summarized in the district court's final approval order, and none of those objectors has appealed. [ER-29-30]

such weighty issues of alleged discrimination as a theater's offer of free popcorn to furloughed federal workers. [*Id.*; 3-SER-413-565]

Additional reasons counsel skepticism as to these objections. Objector Frye, for example, subscribed to Tinder Plus solely for litigation purposes. He created his Tinder account on February 23, 2016, but never opened the app again until February 3, 2018—five days after the appellate decision in *Candelore* issued—when he bought a monthly subscription to Tinder Plus. [3-SER-586] He paid monthly for his subscription for the next year, even though he never used the app after April 25, 2018 and never used any subscription benefits. [*Id.*] In fact, he sent only four Tinder app messages over his entire three-year tenure as an account holder. [3-SER-630]

Objector Allison, for his part, violated Tinder's TOU in both the creation and use of his account. Tinder found no account associated with the email address or phone number provided in Allison's objection. [3-SER-587] Using Allison's area of residence and the purchase dates on the receipts provided with his objection, Tinder identified an account that closely matches those parameters, but under another name. [3-SER-587, 630-31] Creating an account under an alias violates the TOU to which Allison agreed when he opened his account. [3-SER-631, 638] Furthermore, assuming the account in question is Allison's, he testified falsely in response to an interrogatory by denying use of an alias on Tinder. [3-SER-623] And

his objection itself, which provided a different email address for his account, would also thus contain false information.[8]  [ER-188]

Allison and Frye (through their counsel) filed three briefs opposing final approval.  The district court considered all three briefs, including an unauthorized "sur-reply."  [ER-18, 30]  Following a fairness hearing, the district court issued a lengthy, detailed opinion approving the settlement. [ER-18-35]

## ARGUMENT

The underlying litigation against Tinder—*Candelore* and *Kim* alike—is a lawyer-driven exercise in which the putative class members suffered no demonstrable harm, liability and class certification are both unlikely, and individual arbitration was always available for those wishing to pursue it.  Under these circumstances, the cash and other valuable benefits afforded the settlement class by the settlement are more than fair, reasonable, and adequate.

## I.  The District Court Approved the Settlement Using the Proper Standard of Review.

Objectors contend the district court evaluated the settlement under the wrong standard and ignored signs of purported collusion.  To the contrary, the record clearly shows the district court applied the appropriate Rule 23(e)(2) factors and found the settlement fair under the heightened scrutiny that applies to settlements negotiated

---

[8]  This accountholder (who appears to be Allison) also violated the TOU while using the app by engaging in harassing and racially insensitive conduct.  [3-SER-631, 636-37]

before class certification.[9]  In doing so, the court articulated sound reasons to reject Objectors' arguments, particularly given the substantial hurdles regarding class certification, liability, and damages discussed above and further below.  [ER-26-29]

Citing *SFBSC*, Objectors characterize the district court as having impermissibly "presumed" the settlement was fair because it was negotiated at arm's length by experienced counsel and with mediator involvement.  *SFBSC* held merely (and unsurprisingly) that such a presumption, *without more*, would be insufficient. 944 F.3d at 1049 n.12 ("Rule 23(e)(2) now identifies 'whether … the proposal was negotiated at arm's length' as one of four factors that courts must consider and does not suggest that an affirmative answer to that one question creates a favorable presumption on review of the other three.").  The district court here analyzed each Rule 23(e)(2) factor independently, without any presumption of fairness as to the other factors. [ER-22, 25-32]

Similarly, although the district court made passing reference—on the topic of arm's-length negotiations—to decisions mentioning a presumption of fairness, the court nonetheless found this factor independently satisfied without reliance on mere

---

[9]  The factors to be considered include "the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposal." *Murphy v. SFBSC Mgmt.*, 944 F.3d 1035, 1048 (9th Cir. 2019).  The district court cited those factors [ER-25] and analyzed them in detail [ER-26-33], except for the inapplicable factor of governmental participation.  *See SFBSC*, 944 F.3d at 1048 ("a district court 'may consider some or all of the . . . factors'") (quoting *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 963 (9th Cir. 2009)).

presumption. The court noted that the views of experienced class counsel "weigh[] in favor" of finding the settlement reasonable. [ER-29] A court's reference to a permissible consideration cannot be equated to applying a "presumption." In the same vein, the court appropriately noted Judge Meisinger's view that the settlement was both fair and vigorously negotiated. [ER-19, 26, 28] This Court has endorsed such considerations as valid fairness indicators. *See, e.g.*, *In re Hyundai & Kia Fuel Economy Litig.*, 926 F.3d 539, 569 (9th Cir. 2019) (noting role of "respected and experienced mediator" in negotiating settlement).

Nor did the court ignore purported "subtle signs" of collusion, such as high fees relative to the value of the settlement, a "clear-sailing" provision, or a "reverter." *See SFBSC*, 944 F.3d at 1049. To the contrary, the court analyzed Kim's counsel's fee request and determined that the request was commensurate with the benefits to class members under the settlement. [ER-32-34] That determination implicitly negated any notion that the so-called "clear-sailing" provision in the settlement agreement was suggestive of collusion. *See SFBSC*, 944 F.3d at 1051 (impact of clear-sailing provision on fairness of settlement is determined by scrutinizing relationship between attorneys' fees and class benefit). [10] And, because the

_____

[10] Even assuming, *arguendo*, that the district court was obliged to independently assess the clear-sailing provision despite having found the fee request to be proportionate to the settlement's benefits, any failure to conduct that analysis was harmless error. *See Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1127 (9th Cir. 2020) ("[A]ny error in the district court's discussion of [the clear-sailing] factor is harmless. No one factor is dispositive.").

326367475.2

settlement contains no "reverter" of settlement benefits, there was no basis to analyze whether a "reverter" was suggestive of collusion.[11]

Objectors cannot transform their disagreement with the district court's finding that the Rule 23(e)(2) factors were satisfied into an argument that the court ignored those factors or gave weight to irrelevant ones. And because the district court assessed the settlement through the appropriate lens, Objectors must shoulder a heavy burden to demonstrate that its approval was an abuse of discretion. There is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Hyundai*, 926 F.3d at 556 (quoting *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2019)). Only a "strong showing" that the district court abused its discretion warrants overturning a settlement. *Id.* (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998)). "As long as the district court applied the correct legal standard to findings that are not clearly erroneous," its exercise of discretion must be affirmed. *Id.* (citing *Bluetooth Headset*, 654 F.3d at 940). As shown below, Objectors offer no supportable basis to find reversible error here.

## II. The District Court Did Not Abuse Its Discretion in Finding the Settlement Resulted from a Fair Process.

Objectors portray Kim as negotiating from a weaker position relative to Candelore (had the latter actually pursued settlement), but this portrayal is belied by the record. Candelore had litigated for nearly four years when *Kim* was settled, and

---

[11] *See Campbell*, 951 F.3d at 1127 ("reverter" analysis inapplicable where the settlement contains no reverter provision).

had barely advanced past the pleading stage. As the district court noted, the appellate decision in *Candelore* held merely that he had stated a claim, only the first of many difficult steps necessary to certify a class and prove class-wide liability and damages. [ER-26] The district court also noted the absence of any case awarding damages on account of ineligibility for an age-based discount—a challenge both Kim and Candelore faced in their respective cases.[12] [*Id.*]

Relatedly, Objectors contend that Tinder conducted a "reverse auction" to play the *Kim* and *Candelore* counsel against one another. Nothing of the kind occurred. Counsel for Kim and Tinder periodically discussed settlement for months before mediating, while there were no settlement overtures by either side in *Candelore*. [1-SER-154; 3-SER-608-09] Thus, Tinder never received competing proposals that arguably might encourage so-called reverse bidding. Nor was it remarkable that Kim's counsel first explored settlement, as her counsel had pursued

---

[12] In assessing the risk of liability presented by Tinder's pricing model, the district court had discretion to apply the analysis of *Javorsky* rather than of *Candelore*, and correctly did so. *Javorsky* hewed closely to the governing caselaw on age discrimination under the Unruh Act, while *Candelore* broke with decades of precedent in questioning for the first time a pricing model based upon the proven nexus between age and income. *See Powell v. Wells Fargo Home Mortg.*, 2016 WL 1718189, at *16 (N.D. Cal. Apr. 29, 2016) (citing *McQuirk v. Donnelley*, 189 F.3d 793, 797 (9th Cir. 1999)) ("When faced with conflicting intermediate appellate court authority, a federal court applying California law must predict how the California Supreme Court would rule."); *DeWitt v. W. Pac. Ry. Co.*, 719 F.2d 1448, 1453 (9th Cir. 1983) (choosing intermediate appellate authority over contrary line that "refused to follow the holding" of previous cases). Thus, as the district court's analysis confirmed, *Candelore*, not *Javorsky*, is the "outlier," and Objectors cannot place undue reliance on it to speculate that different settlement outcomes were likely or warranted.

326367475.2

the same theory of liability in various lawsuits filed since the 2015 launch of Tinder Plus.[13] Tinder's dialogue with Kim's counsel reflected a desire to resolve this serial litigation, with settlement discussions facilitated by a highly regarded former judge.

Objectors also descry "indicia of collusion" by mischaracterizing the size of the attorneys' fees award relative to the settlement value. The automatic Super-Like component of the settlement alone—ignoring its other benefits—is worth $12 million, and counsel were awarded one-tenth that amount ($1.2 million). Even accepting Objectors' contention that 44% of the settlement class would find limited utility in additional Super Likes, this component would still be worth $6.72 million, more than five times the fees awarded. Then there is the additional $6 million in cash that the settlement made available to class members filing claims. While relatively few class members availed themselves of this opportunity, the claims rate of course was not known to the parties when the fee component of the settlement was negotiated.[14]

Nor is this a case where the settlement structure allows Tinder to retain suspect proceeds or forces class members into further expenditures before they can enjoy settlement benefits. In *SFBSC*, for example, the defendant was sued for underpaying employees. In vacating the settlement, this Court noted that "coupon" settlement

---

[13] Kim's counsel filed the first of several lawsuits regarding Tinder Plus pricing within days after Tinder Plus was released in March 2015. [1-SER-150-51]

[14] Should the Court deem the fees excessive, the proper course would be to affirm the settlement and reduce the fee award. *See In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 179 (3d Cir. 2013) (where court determines fee award should be reduced, appropriate course is not to invalidate settlement but to simply "decrease the fee award").

terms can be suspect where they enable the defendant to retain "ill-gotten gains." 944 F.3d at 1054. Here, the challenged pricing model did not result in supra-competitive profits; instead, Tinder accepted *lower* revenue to facilitate greater access by younger subscribers (and was then sued for doing so). And unlike coupons, the Super Likes automatically available under the settlement provide value to class members without requiring an additional purchase (and thus are not a self-interested means of raising revenue).

Finally, all of Objectors' arguments premised on Kim's supposed lack of negotiating leverage are not only factually incorrect but analytically misdirected. The touchstone for settlement approval is not whether other counsel might have negotiated a different deal (even a better one), but whether the settlement before the court is fair, reasonable, and adequate, and was reached by means of a fair, arm's-length process. This Court's recent *en banc* decision in *Hyundai* is instructive.

The initial panel decision in *Hyundai* (since vacated) concluded that impaired bargaining power by the settling plaintiffs' counsel rendered them susceptible to a less advantageous deal. *See* 881 F.3d 679, 702-03. The subsequent *en banc* decision eschewed that analytical approach and focused instead on whether the settlement terms offered adequate relief and whether the negotiating process was fair—finding it significant that, as here, the settlement was reached under the auspices of a mediator. *See* 926 F.3d at 569-70. The *en banc* Court did not even discuss relative bargaining strength as a separate factor for review. Equally important, the Court re-emphasized that district court determinations that a class settlement was fair, adequate, and reasonable must be accorded substantial deference. *Id.* at 569 ("When

the district court determines that a proposed settlement is fundamentally fair, adequate, and reasonable, our review 'is extremely limited.'") (quoting *Hanlon*, 150 F.3d at 1026).

## III.   The District Court Did Not Abuse Its Discretion in Finding the Settlement Fair, Reasonable, and Adequate.

As to the substantive fairness of the settlement, Objectors err by attacking individual components rather than addressing it holistically.  *See Hyundai*, 926 F.3d at 569 ("We consider the overall fairness of the settlement taken as a whole, rather than the individual component parts, because neither the district court nor this court has the ability to delete, modify or substitute certain provisions.") (internal quotation marks omitted); *Lane v. Facebook, Inc.*, 696 F.3d 811, 824 (9th Cir. 2012) (focusing on "the district court's conclusion as to the fairness and adequacy of the overall settlement amount to the class *as a whole*") (emphasis in original).  Viewed in its entirety, the settlement provides not merely fair compensation but arguably a windfall to a large subscriber group who suffered no demonstrable harm yet will receive substantial automatic awards and optional additional benefits.[15]  And though

---

[15]   Indeed, Objectors cite no case holding that a district court exceeded its discretion in approving a similarly structured class settlement.  (*See* AOB 45-53.)  The cases Objectors cite are readily distinguishable.  In *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071 (9th Cir. 2017), for example, the settlement only provided for injunctive relief, yet class members—without even receiving notice of the settlement—released any right to recover damages in future class actions.  *Id.* at 1075.  Those problems are clearly not present here.  In *Allen v. Bedolla*, 787 F.3d 1218 (9th Cir. 2015), the settlement was remanded, not because of any substantive defects but because the court had not sufficiently attended to the Rule 23(e)(2) factors.  The district court here *did* assess all relevant considerations.  And, in *Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003), the settlement was rejected because it provided for payment of attorneys' fees without court application, and because fully half of the monetary

collective value is the appropriate consideration, each settlement component has clear value of its own:

### A. The Award of 50 Super Likes to Every Class Member Provides Demonstrable Value.

The settlement automatically provides each of the 240,000 class members with 50 Super Likes—valued at $1 each—so long as they have a Tinder account.[16] Objectors contend Super Likes are worth less than $1 and provide no meaningful value to Tinder Plus and Tinder Gold subscribers, but this argument fails for a number of reasons.

First, Tinder users, including Plus and Gold subscribers, regularly purchase additional Super Likes. [ER-217-18] When they do, the price—and thus the value—is $1. [3-SER-587] Objectors contend the true value is less than $1 because Plus and Gold subscribers already receive 150 Super Likes per month with their subscriptions. (AOB, p. 19.) That is inaccurate—subscribers receive five Super Likes per day, which expire that day if not used (as does the one Super Like per day for non-subscribers)—so on any given day a subscriber has only five, not up to 150, Super Likes. [3-SER-587] That is among the reasons why subscribers can and do buy additional Super Likes—an average of 34 per month—and pay $1 for each. [*Id.*; ER-217-18]

---

award was allocated to the named plaintiffs and select class members, leaving the vast majority of the class to split the other half. Again, no similar circumstances or concerns exist here.

[16] Class members without a current account can easily re-open or create one at no charge.

326367475.2

Second, the settlement Super Likes, unlike those that accompany Tinder Plus and Gold subscriptions, do not expire.[17] Thus, even subscribers who buy fewer than average additional Super Likes on an à la carte basis will benefit from an additional cache of Super Likes that never expire.

Third, Objectors overlook that subscribers to Tinder Plus and Tinder Gold often continue to use the free app after their subscriptions (and, thus, their allotment of five Super Likes per day) expire. Settlement class members in that category will benefit from having an additional 50 Super Likes.

Fourth, Objectors note that 44% of the settlement class members do not currently maintain a Tinder account and so might not benefit from free Super Likes. But every class member is entitled to additional benefits, including cash, by simply submitting a claim form. No Tinder account is needed. And for class members who would need to reopen a Tinder account to receive the free Super Likes, the few minutes required to rejoin are at most a minor inconvenience to realize that value.[18]

Fifth, Objectors posit an "annual attrition rate" of 13% of the settlement class as Tinder accountholders, which they contend will result in fewer class members being current Tinder users by the time the settlement is implemented. This concern is in large measure a byproduct of Objectors' own actions—the settlement would

---

[17] *See* https://www.help.tinder.com/hc/en-us/articles/115004493543-Super-Like.

[18] Not every form of compensation offered in a class settlement need be desirable to every class member. *See, e.g., Hyundai*, 926 F.3d at 554 (approving settlement that allowed class members to choose among four options); *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 320-27 (N.D. Cal. 2018) (overruling objections by different class members to different aspects of settlement, finding that settlement, overall, was fair and adequate).

326367475.2

have already been consummated but for this appeal, which Objectors have prosecuted at a leisurely pace. In any event, Objectors' analysis mistakenly assumes that the entire class was fixed as of 2015, whereas the class actually comprises anyone over age 28 who purchased a subscription during the four-year period preceding March 1, 2019. Given the typical cycle of a Tinder account, users who bought subscriptions later in the class period are more likely to remain accountholders when the settlement is implemented. Objectors' analysis thus overstates any attrition rate.

## B. The Ability to Claim Additional Benefits Worth $25 or More Provides Further Value.

Objectors do not dispute that the settlement offers additional valuable benefits that include cash awards. However, they contend it was onerous to require a claim form to seek such added benefits. But unlike the benefits that could be awarded automatically, a claim form for the cash component is essential because Tinder simply does not have the physical address or banking information required to make payments to class members unilaterally. [ER-218] *See Hyundai*, 926 F.3d at 568 (requiring claim form to obtain payment is reasonable where defendant lacks information necessary to make payment).[19]

This Court has held on several occasions that a district court properly approved a class settlement involving claim forms. *See*, *e.g.*, *Rodriguez*, 563 F.3d at 967; *Fraley v. Facebook, Inc.*, 2016 WL 145984, at *1 (9th Cir. Jan. 6, 2016) (no

---

[19] All in-app subscription and à la carte payments were made though Apple or Google. As a result, Tinder lacks the credit/debit card information that would be necessary for a direct transfer of funds to class members. [ER-218]

326367475.2

abuse of discretion where settlement was structured to distribute cash only if class members submitted claim forms). "[T]here is nothing inherently objectionable with a claims-submission process, as class action settlements often include this process, and courts routinely approve claims made settlements." *Shames v. Hertz Corp.*, 2012 WL 5392159, at *9 (S.D. Cal. Nov. 5, 2012) (collecting cases from district courts within this Circuit that approved claims-submission settlement processes).

### C.   No "Monetary Fund" Was Appropriate for a Settlement Featuring Automatic Awards, and the Claims Rate for the Additional Benefits Was Reasonable.

Objectors complain the settlement does not establish a "monetary fund" and allows unclaimed amounts to "revert" to Tinder. But the primary element of the settlement is $12 million in benefits that will be provided automatically to settlement class members; thus, there is no need for a fund and no arguable "reverter." Objectors cite no case suggesting a fund is necessary where benefits are automatically distributed. Likewise, the $6 million in additional benefits involves a choice between cash and other benefits, a feature that enables consumers to maximize personal value, but is by nature unsuited to a fund structure.[20]

---

[20] A settlement under the Unruh Act can be adequate without any monetary compensation at all. The district court, citing *Carter v. City of Los Angeles*, 224 Cal. App. 4th 808 (2014), correctly noted that a class settlement under the Unruh Act can be adequate based solely on injunctive relief (one of the forms of relief provided here). The district court did not, as Objectors suggest, misconstrue *Carter*. While the appellate court in *Carter* vacated the settlement in that case, it did so because the parties had usurped the court's role in class certification and had erroneously characterized potential damages as incidental to injunctive relief. *Id.* at 824-26. That court nonetheless confirmed the adequacy of a settlement based

326367475.2

Furthermore, while Objectors cast aspersions on the claims rate for the additional benefits made available under the settlement, the claims rate must be viewed in the context of a "no injury" case where the primary settlement benefits are provided automatically. Indeed, even where class settlements did not afford automatic benefits, this Court has affirmed approval "where less than five percent of the class members file claims." *Hyundai*, 926 F.3d at 568 (quoting *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 945 (9th Cir. 2015)).[21] Because class members here did not suffer any monetary harm by reason of their ineligibility to receive a modest youth discount, they were likely disinclined to seek benefits beyond those automatically awarded.

### D. The Settlement Treats All Class Members Equitably.

Because all class members are entitled to the same benefits, the settlement does not favor one group at the expense of another. Objectors instead contend that the settlement *should* distinguish between class members who are bound by the arbitration agreement in the TOU and those who are not (with the latter purportedly being better positioned). But class settlements by nature involve some leveling of individual claim characteristics. If class members in either group found the settlement personally unfavorable, they were free to opt out and pursue individual

---

entirely on injunctive relief where, as here, the existence of actual damages is doubtful. *Id.* at 821-22.

[21] Objectors also fail to acknowledge that an additional round of email notice was provided after the hearing on final approval, and the claims period remained open for an additional 30 days, which would increase the claims rate. [ER-20-21, 70; 1-SER-165-66; 2-SER-224-25]

326367475.2

claims in court or arbitration (as applicable), with comparable remedies available in either forum.[22] That class members are not all similarly situated with respect to arbitration is irrelevant so long as the settlement benefits are adequate for the class considered as a whole. *See, e.g.*, *Lee v. JPMorgan & Chase Co.*, 2015 WL 12711659, at *1 (C.D. Cal. Apr. 28, 2015) (granting final approval of class settlement where "[s]ome of the [putative class members'] agreements explicitly required arbitration on an individual basis, others were silent on the question of class arbitration, and 21 putative class members had not signed arbitration agreements at all"). Nor is the TOU's arbitration and class waiver provision the only obstacle to success in this class litigation; as discussed further below, problems with certification and on the merits abound for the putative class.

In short, there is no meaningful difference between the two groups for settlement purposes, and the negligible opt-out rate (driven almost entirely by one law firm) confirms that class members in both groups are content to accept the settlement's benefits.

### E. The Settlement Addresses Prospective Pricing Practices.

Objectors erroneously characterize the settlement as allowing Tinder to "continue to discriminate." They note that subscriptions to Tinder Plus and Tinder Gold automatically renew following each subscription period unless the user cancels

---

[22] The premise of Objectors' argument is thus flawed, because class members who accepted the arbitration agreement are not disadvantaged relative to other class members. The remedies available under the Unruh Act are the same whether pursued through arbitration or in court, and arbitration is an attractive alternative (evidenced here by the hundreds of arbitrations filed by clients of Davis & Norris [3-SER-607]).

this feature. [*See* 3-SER-578] Thus, subscribers who were under 29 when they initially subscribed could auto-renew at the lower price even after February 5, 2019 (when Tinder equalized pricing for all new subscriptions in California regardless of subscriber age), though this group will steadily decrease as their subscriptions come to an end.

There are several problems with Objectors' argument. The settlement class is being compensated for whatever purported harm they suffered by subscribing at a time when younger users were offered lower prices. Compensation to class members is compensation for *that* price differential. The fact that some younger subscribers will continue to receive the lower price until they cancel does not mean that class members are not being adequately compensated under the settlement for having subscribed at a time when a lower price was offered to younger users.

Class settlements often effectuate practice changes as to new consumers while preserving the contracts and policies that govern existing consumers. *See, e.g., Bostick v. Herbalife Int'l of Am., Inc.*, 2015 WL 12731932, at *5 (C.D. Cal. May 14, 2015) (requiring certain financial disclosures in contracts for new members only); *Williamson v. McAfee, Inc.*, 2016 WL 4524307, at *3 (N.D. Cal. Aug. 30, 2016) (same). Existing customers have a fair expectation that Tinder will honor the contract subscription price. Tinder's TOU states: "If you purchase an auto-recurring periodic subscription, your Payment Method will continue to be billed for the subscription until you cancel. After your initial subscription commitment period, and again after any subsequent subscription period, your subscription will automatically continue for an additional equivalent period, at *the price you agreed*

*to when subscribing*." [3-SER-596 (emphasis added)] Objectors cannot force Tinder to breach the contracts it entered into with under-29 users by raising the price of their subscriptions—as this group was never before the district court, did not receive notice of the settlement, and lacked any opportunity to object or exclude themselves.

In addition, and most importantly, no even arguable *prospective* price discrimination persists because ever since February 5, 2019, all new California subscribers have been paying the same price regardless of age.

Finally, Objectors cite no authority—and Tinder is aware of none—that suggests Unruh Act compliance mandates that Tinder reduce all subscription prices to what users under age 29 were charged. As to prospective compliance, the statute at most requires parity; it does not impose a duty to achieve uniformity by price reductions for the previously disadvantaged group as opposed to price increases for the previously advantaged group. Once again, Objectors have merely articulated a preference for a different settlement, not a basis to deem the settlement under review unfair.

While the irony of the outcome here (that this litigation has succeeded principally in raising prices for young adults in California) should not be lost on anyone evaluating the ultimate merit of the claims, the "injunctive" provisions of the settlement nonetheless have real value—at least in the cloistered world of cases like *Candelore* and *Kim* that thrive on legal technicalities involving no actual harm. The settlement effectuates the very same practice change—equal pricing—that Objectors'

counsel seek in their own case. They thus are in no position to disparage the value of this relief to the settlement class.

## IV. The Settlement Is Fair Given Tinder's Significant Defenses to Liability and Damages.

As part of its analysis of whether the settlement terms were fair, reasonable, and adequate, the district court properly considered the many challenges facing Kim, or Candelore as well, in establishing class-wide liability and damages in a contested setting. As discussed below, those challenges would be significant.

### A. No Class Member Was Economically Harmed.

Objectors' core premise is that *Kim* and *Candelore* are high-value cases that would assuredly deliver at least $4,000 in statutory damages to every class member if litigated to conclusion. But damages under the Unruh Act require a showing of actual harm, *see* CACI No. 3060, and it is difficult to discern any harm under these facts. Even the novel test fashioned in *Candelore* deems youth discounts presumptively lawful if the age group has been recognized in legislative enactments as deserving of special benefits or protection. *See* 19 Cal. App. 5th at 1149. A youth discount with an age cut-off of 21, for example—an age group that enjoys various protections under the law—would be presumptively valid under *Candelore*. Had Tinder capped its youth discount at 21 or some lower age, or had Tinder simply had no youth discount at all, Kim, Candelore, and every member of the settlement class still would have paid the same price because they were all at least 29 when they subscribed.

The aim of these lawsuits is to extract a windfall from Tinder's decision to offer a lower price to a disadvantaged age group, even though the discount had no effect on the price paid by these plaintiffs or the class they represent. This clear absence of harm likely explains why there is not a single case awarding damages under the Unruh Act to someone who did not qualify for an age-based discount.

**B.      Establishing Unruh Act Liability Would Be Difficult.**

Discrimination is only unlawful under the Unruh Act when it is arbitrary, unreasonable, or invidious (*Sargoy*, 8 Cal. App. 4th at 1043), meaning that the discrimination "'emphasizes irrelevant differences' or perpetuates … irrational stereotypes." *Cohn v. Corinthian Colleges, Inc.*, 169 Cal. App. 4th 523, 528 (2008) (quoting *Koire v. Metro Car Wash*, 40 Cal. 3d 24, 34-35 (1985)); *see also Javorsky*, 242 Cal. App. 4th at 1404 ("Invidious discrimination is the treatment of individuals in a manner that is malicious, hostile, or damaging."). The Unruh Act also requires proof of an intent to discriminate. *Harris v. Capital Growth Investors XIV*, 52 Cal. 3d 1142, 1149 (1991).

Among the facts Tinder would establish if the case were to proceed is that before implementing its youth discount the company conducted extensive market research which demonstrated that younger users were generally unwilling to pay full price for Tinder Plus—a finding consistent with the fact that younger people generally have less disposable income.[23] As noted above, no California court had

_____

[23]    Although the *Candelore* court acknowledged Tinder had conducted price research, the court was not aware of the results given that the appeal involved a pleading-stage challenge. If litigation were to resume, Tinder would present compelling evidence of the research that justified its youth discount.

ever held an age-based price discount to be unlawful (and that is still the case).  Thus, Tinder possessed a reasonable, good-faith basis for its pricing model, which was further validated when the Court of Appeal in *Javorsky* upheld a similar under-30 gym membership discount.  It was not until several years later that another district of the Court of Appeal, in *Candelore*, upended longstanding precedent and announced an entirely different standard for evaluating age-based price discounts.  Under these circumstances, Tinder's pricing was not unreasonably, arbitrarily, or invidiously discriminatory, nor was there any intent to engage in unlawful discrimination.

California law makes clear that inclusive policies favoring lower-income age groups do not violate the Unruh Act.  *See, e.g., Pizarro*, 135 Cal. App. 4th at 1176 (citing relative lack of job security and disposable income in upholding price discount for "baby boomers");[24] *Starkman*, 227 Cal. App. 3d at 1499 ("[W]ithout [price] incentives[,] these populations may be totally excluded from enjoying some of the pleasures of our society."); *Javorsky*, 242 Cal. App. 4th 1386 (goal of facilitating access for age group with lower income held sufficient to justify discount pricing plan).  Equally important, the Unruh Act "does not permit courts to engage in complex economic regulation under the guise of judicial decisionmaking.  … That is a matter for the Legislature alone.  Judicial intervention in such economic

---

[24] Many of the baby boomers (born 1946 to 1964) who received the ticket discount in *Pizarro* were at peak earnings age at the time of the 2006 decision.  The discount was still found to be lawful, reflective of the liberal standard for age-tiered pricing that has long existed under California law.

issues is inappropriate." *Lazar*, 69 Cal. App. 4th at 1502-03 (internal citations and quotations omitted).

Here, Tinder's pricing for young adults is (in California, was) inclusive and consistent with the public policy favoring provision of greater access and opportunity to members of lower-income age groups (in contrast to the exclusionary housing practices invalidated in *Marina Point* and *O'Connor*). And, like the similar age group in *Javorsky*, the group served by Tinder's youth discount has limited financial resources.

Nor does Tinder stand alone in offering such a discount. Discounts for younger people, sometimes including those in their 30s, are common among businesses and organizations in California and nationwide.[25] Considering this widespread practice, any plaintiff challenging the lawfulness of Tinder's offer of a similar discount to its own customers faces a serious obstacle in establishing that the discount constituted intentionally arbitrary, unreasonable, or invidious discrimination.[26]

### C. Tinder Has Substantial Defenses to Liability and Class Certification Under *Candelore* Itself.

The trial court in *Candelore* recognized that Tinder's youth discount was in harmony with the state's Unruh Act jurisprudence and summarily rejected the

---

[25] Examples are listed in Exhibit 1 (pp. 52-53, *infra*), which is included in the brief's word count.

[26] And without an Unruh Act violation, there is neither "unlawful" conduct under the UCL, nor any violation of public policy that would support a claim under the UCL's "unfair" prong.

challenge.  Then came the Court of Appeal's idiosyncratic decision, itself at odds with that jurisprudence.  Objectors act as if that decision determined liability against Tinder.  But it did not; otherwise, the court would simply have remanded for calculation of damages.  To be clear, the only issue raised and decided in the *Candelore* appeal was whether Candelore's complaint stated a cause of action—a threshold pleading matter far antecedent to merits liability, let alone damages.  Accordingly, the Court of Appeal did not address, because it had no reason or occasion to address, important defenses to any Unruh Act liability.

Even under the doctrinally flawed approach taken in *Candelore*, there would be little prospect of class recovery.  In fashioning its new test for liability, *Candelore* adopted a fact-based analysis that emphasized the "individualized" nature of the statutory right to be free from invidious age discrimination.  The *Candelore* court questioned whether age-based pricing policies, which depend upon generalizations about the relationship between age and income, could be justified given the virtual certainty that at least some members of the price-disadvantaged group would have less income than some members of the price-advantaged group, leading to the conclusion that the policy abridged the rights of *some* Californians.

*Candelore* did not consider who among the older group price-disadvantaged by Tinder's youth discount has a claim for damages under the Unruh Act, and certainly did not hold that *everyone* in that group has a viable discrimination claim.  Indeed, given the decision's focus on the individualized nature of Unruh Act rights, it follows that only those members of the price-disadvantaged group who *in fact* were less well off than the members of the price-advantaged group could have such

a claim (assuming they could establish actual harm).  As a result, (i) because the discount policy's generalization about the age/income relationship is accurate overall, the vast majority of the class members would have *no* claim, and (ii) because determining who *does* have a claim would require many complex individualized assessments, membership in the class could not be readily ascertained, and class certification would therefore be impracticable if not impossible.

Separately, Tinder could likely establish that its youth discount permissible under the "legislative enactments" prong of the test fashioned in *Candelore*.   Under that standard, age-based price discrimination that might otherwise run afoul of the Unruh Act can be justified if the group benefiting from the discount has been the subject of some form of legislative largesse, even if unrelated to the discount in question.  *See* 19 Cal. App. 5th at 1149.  Here, legislative enactments have benefited and supported the group that qualified for Tinder's discount.  *See, e.g.*, Assemb. Con. Res. No. 53, Assemb. Sess. 2017-18 (Cal. 2017) (declaring month of April 2017 Financial Fitness Month to raise public awareness and finding that: (1) "4 in 10 millennials say they are overwhelmed with debt and more than one-half say they are living paycheck to paycheck, leaving them no ability to save for the future"; and (2) "Millennials are 'financially fragile.' … Only 36 percent of millennials have a retirement account, 17 percent with an account took a loan in the past 12 months, and 14 percent took a hardship withdrawal in the past 12 months."); *see also* Patient Protection and Affordable Care Act, 42 U.S.C. §§ 18001 *et seq.* (2010); *People Under 30: How to get or stay on a parent's plan*,

https://www.healthcare.gov/young-adults/children-under-26/ (last visited March 13, 2020) (adult children may stay on parent's health insurance plan until age 26).

These examples illustrate social policies that favor the same young adults in California who stood to benefit from Tinder's discount. Thus, even *Candelore*'s "legislative enactments" test—a newcomer (if not complete stranger) to California's Unruh Act jurisprudence—is likely satisfied here.[27]

### D. Strong Contractual Defenses to Liability and Damages Exist.

The relationship between Tinder and the class members (or at least 95% of the class) is governed by Tinder's Terms of Use. This agreement provides additional powerful defenses to liability or damages under the Unruh Act that would impair any pursuit of class recovery.

### 1. Texas law governs the relationship.

Every version of the TOU since 2014 has included a Texas choice-of-law provision that governs claims or disputes involving Tinder's services. [3-SER-580] This provision is enforceable under both California and Texas law. *See Harris v. Bingham McCutchen LLP*, 214 Cal. App. 4th 1399, 1404 (2013) (citing *Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459, 464-65 (1992)) ("California strongly favors enforcement of choice-of-law provisions."); *Exxon Mobil Corp. v. Drennen*,

---

[27]  Tinder did not raise this California legislation during the *Candelore* appeal, because no court had previously imposed a legislative-enactments test. At most, some decisions had observed that legislation favoring age groups receiving the discount under consideration confirmed their legal analysis. *See Javorsky*, 242 Cal. App. 4th at 1396-99 (discussing role of legislative enactments in prior cases); *see also Pizarro*, 135 Cal. App. 4th 1171 (upholding baby-boomer discount without citing any legislative enactment benefitting that age group).

326367475.2

452 S.W.3d 319, 324 (Tex. 2014) (choice-of-law provision enforceable if it bears some relation to parties and their agreement).

Both states employ a three-part test to enforce a choice-of-law provision. In California, the court first determines whether the chosen state (here, Texas) has a "substantial relationship to the parties or their transaction," or whether "there is any other reasonable basis" for the chosen state's law to apply. *Nedlloyd*, 3 Cal. 4th at 466. Both criteria are met here because Tinder, Inc. was based partially in Texas until 2017 and has since merged completely into Texas-based Match Group, LLC. [ER-365; 1-SER-5-6] *See, e.g.*, *Kissel v. Code 42 Software, Inc.*, 2016 WL 7647691, at *3 (C.D. Cal. Apr. 14, 2016) (both factors satisfied "where one party resides or is domiciled in the chosen state"). And in Texas, the court first determines whether the claim at issue falls within the scope of the choice-of-law provision. *Stier v. Reading & Bates Corp.*, 992 S.W.2d 423, 433 (Tex. 1999). The choice-of-law provision here is broadly worded to encompass any dispute pertaining to Tinder's services and thus encompasses a claim regarding the price charged for those services. [3-SER-604]

Both states would then look to whether Texas law is contrary to a fundamental policy of the forum state, here California. *See Nedlloyd*, 3 Cal. 4th at 464; *Drennen*, 452 S.W.3d at 325-28. No case has held that the Unruh Act constitutes a fundamental California policy, but even if one were implicated, Texas law would still apply unless, under the third step in the test, California has a "materially greater interest than [Texas] in the determination of the particular issue …." *Nedlloyd*, 3 Cal. 4th at 466 (citing Rest. (Second) Conflict of Laws § 187, subd. (2)); *Drennen*,

452 S.W.3d at 325-28 (citing same Restatement provision).  Here, California, like any other state, has at most an equal interest with Texas in the application of their respective anti-discrimination laws, and Texas has no less of an interest in the enforcement of its laws than does California or any other state.

Tinder is unaware of any Texas statute or other authority that treats age as a protected category with respect to public accommodations or business establishments.  Accordingly, were litigation to resume, Tinder would seek summary judgment on the grounds that the Unruh Act does not apply.[28]

## 2. The TOU likely prohibits statutory damages.

Tinder's TOU also includes a limitation of liability provision that prohibits certain kinds of damages, such as "enhanced damages" or "excessive fines," and limits any recoverable damages to the amount the user paid to Tinder during the 24-month period preceding the claim.  [3-SER-600]  Limitation of liability provisions "'have long been recognized as valid in California.'"  *Lewis v. YouTube, LLC*, 244 Cal. App. 4th 118, 125 (2015) (quoting *Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118 (2012)); *see also Markborough Calif., Inc. v. Superior Ct.*, 227 Cal. App. 3d 705, 714 (1991).[29]  Statutory damages bear no relation to any

---

[28]  Tinder could not assert this choice-of-law defense when it filed its demurrer in *Candelore*, as a demurrer is based solely on the pleadings.  Nor had *Kim* reached a stage where a motion based on the TOU's choice-of-law provision would be appropriate.

[29]  Contractual limitations on recoverable damages are also valid under Texas law. *E.g.*, *Arthur's Garage, Inc. v. Racal-Chubb Sec. Sys., Inc.*, 997 S.W.2d 803, 810 (Tex. App.—Dallas 1999, no pet.); *Fox Elec. Co. v. Tone Guard Security, Inc.*, 861 S.W.2d 79, 81-83 (Tex. App.—Fort Worth 1993, no writ).

326367475.2

purported actual damages in this case and therefore qualify as "enhanced damages" and/or "excessive fines" that are barred by the TOU.

Objectors imply that the limitation of liability provision is unenforceable, but a waiver of Unruh Act statutory damages is permissible under Civil Code section 52(i). Section 52(a) governs damages in Unruh Act cases (except in construction-based disability-access cases) and provides for both actual and statutory damages. Section 52(i) prohibits waiver by contract of rights under subdivisions (b) through (f) of Section 52, but makes no mention of subdivision (a), thereby confirming that a waiver of damages under subdivision (a)—including statutory damages—is permissible under standard canons of statutory construction. *See Dyna-Med, Inc. v. Fair Emp't & Hous. Comm'n*, 43 Cal. 3d 1379, 1409 n.7 (1987) ("the expression of certain things in a statute necessarily involves exclusion of other things not expressed"); *see also Arden Carmichael, Inc. v. Cnty. of Sacramento*, 93 Cal. App. 4th 507, 516 (2001) (under doctrine of *expressio unius est exclusio alterius*, "'[w]hile every word of a statute must be presumed to have been used for a purpose, it is also the case that every word excluded from a statute must be presumed to have been excluded for a purpose'").[30]

---

[30] Objectors cite *Armendariz v. Found. Healthcare Psychcare Servs., Inc.*, 24 Cal. 4th 83 (2000), but that case, which involved statutory rights that govern *employment* relationships, has no bearing on the enforceability of a consumer limitation-of-liability provision. Objectors argue that, under *Armendariz*, "an arbitration agreement cannot be made to serve as a vehicle for the waiver of statutory rights" (AOB 15, n.4), but they neglect to include the remainder of that sentence, the qualifier "created by the FEHA." *Id.* at 101. And in any event the limitation of liability provision here is not contained in the arbitration agreement.

326367475.2

### E. Tinder Has Another Strong Contractual Defense: The Vast Majority of the Settlement Class Is Bound by an Arbitration Agreement and Class Waiver.

Another high barrier to class-wide liability and damages is that most of the putative class is bound by an arbitration agreement and class waiver that has been part of Tinder's TOU since May 22, 2014. [3-SER-580] In support of final approval, Tinder filed declarations based on database records that substantiate settlement class members' assent to the arbitration agreement. [3-SER-579-81, 631-33] Objectors contend that Kim should have pursued "discovery" regarding the arbitration agreement, but when pressed during the fairness hearing, Objectors' counsel could not identify any discovery that might have changed the outcome.[31]

The factual record, summarized below, demonstrates that 95% of the settlement class is precluded *ab initio* from participating in a contested class action, and that individual fact determinations are necessary to identify who among the remaining 5% are also bound to arbitrate. This reality further supports the adequacy of the settlement because, as discussed below, a class cannot be certified where, as here, a significant portion of the putative class is bound by an arbitration agreement.

---

[31] The only topics of discovery Objectors identified at the hearing were (a) the percentage of settlement class members who had assented to the arbitration agreement (via the TOU), and (b) the overall size of the class. [3-SER-641-43] But these matters were comprehensively addressed in the sworn testimony that Tinder submitted in support of final approval. Objectors complain this testimony wasn't "tested" through cross-examination (AOB 55), but that sort of objective data, derived from ordinary-course electronic business records, is routinely accepted in litigation—including class settlements—without cross-examination, and Objectors offered no reason to doubt the veracity of the data. The district court acted well within its discretion in not halting the settlement to require further discovery.

A negotiated class settlement is therefore the only viable means of affording class-wide relief.

### 1. Tinder users' assent to the TOU, including its arbitration agreement and class action waiver

During the first few years of the Tinder app (when the user base was much smaller), the sign-up process did not require users to specifically acknowledge and agree to the TOU. On July 31, 2015, Tinder implemented a popular and accepted method of affirmative assent commonly known as "sign-in wrap," whereby users are directly notified in advance that by signing up for the app (or, having previously downloaded the app, by logging back into their accounts), they are manifesting their agreement to the TOU. [3-SER-580] As a result, all users who signed up for the app on or after July 31, 2015, or who signed up before that date but logged out of and back into their account after that date, are bound by the arbitration agreement and class action waiver contained in the TOU. [*Id.*]

On May 9, 2018, Tinder sent a notice to every accountholder of an amendment to the TOU. The notice explained that, in order to continue using the app, users would need to consent via sign-in wrap to the amended TOU even if they had not previously consented to the TOU via the sign-in-wrap method described above. [3-SER-580, 631-33] The amended TOU, in turn, stated that the arbitration agreement would apply to all previously filed class actions, including both *Kim* and *Candelore*. [3-SER-601-02] Thus, all users—whether or not already bound by the class action waiver for purposes of *Kim* or *Candelore*—were affirmatively notified that continued use of the app required agreement that the waiver applies to those cases.

326367475.2

To ensure fairness, the amendment gave users who had not previously agreed to arbitration 30 days to opt out of this retroactivity provision. [3-SER-631-32] *See Trudeau v. Google LLC*, 349 F. Supp. 3d 869, 872-73 (N.D. Cal. 2018) (granting motion to compel arbitration on basis of arbitration clause that applied retroactively and included substantially similar 30-day opt-out period); *see also Salgado v. Carrows Restaurants, Inc.*, 33 Cal. App. 5th 356, 361-62 (2019) (arbitration agreement entered into while litigation pending may be enforced retroactively). Users, including objector Frye, who had previously accepted the TOU through the sign-in wrap method, could not invoke this opt-out right to avoid the class action waiver for these cases because they had already agreed to that waiver prior to the amendment. [3-SER-585-86, 632-33][32] As a practical matter, the opt-out right primarily applied to users who had not previously expressed consent to the TOU.

### 2. 95% of the settlement class expressly assented to the TOU.

In total, 198,285 users subscribed to Tinder Plus in California when they were at least 29 years old and therefore were ineligible for a youth discount. Of that group, 169,955 accepted the TOU via sign-in-wrap before subscribing to Tinder Plus and therefore are bound by the arbitration agreement and class action waiver. Another 11,888 subscribed to Tinder Plus before accepting the TOU via sign-in-wrap, but

---

[32] Frye created his Tinder account after July 2015 and therefore expressly agreed to the TOU, including the arbitration provision. [3-SER-585-86] Frye asserted in his objection that he had opted out of the arbitration retroactivity provision in the May 9, 2018 version of the TOU. But his purported opt-out is ineffective because he was already bound by the arbitration agreement before he subscribed to Tinder Plus. [3-SER-632-33]

then agreed, via the May 9, 2018 notice and amendment, that those provisions would apply specifically to the *Kim* case (and to *Candelore*). And another 9,361 subscribed to Tinder Plus before accepting the TOU via sign-in-wrap, but later agreed via sign-in-wrap to a version of the TOU other than the May 9, 2018 version. [3-SER-580-81]

Similarly for Tinder Gold: 127,895 users purchased Tinder Gold in California when they were at least 29 years old, and 124,720 of them did so after having accepted the TOU via sign-in-wrap. In addition, 2,401 subscribed to Tinder Gold before accepting the TOU via sign-in-wrap, but then expressly agreed to retroactivity via the May 9, 2018 notice and amendment, and another 72 subscribed to Tinder Gold before accepting the TOU via sign-in-wrap, but later agreed via sign-in-wrap to a version of the TOU other than the May 9, 2018 version.[33] [3-SER-581]

Because 57,924 class members subscribed to both Tinder Plus and Tinder Gold and would be double-counted, subtracting that number from the subscriber total results in 268,256 potential class members.[34] [3-SER-581] Of that total, Tinder has not been able to determine express agreement to the TOU as to only 7,435. [3-SER-581-82] This group presents individual questions whether each was aware of the TOU when creating a Tinder account and using the app and thus is bound by the TOU's arbitration agreement.

---

[33] As noted, the May 9, 2018 amendment enabled users to opt out of arbitration retroactivity, and approximately 250 California users did so. [3-SER-632-33]

[34] The list that was sent to the settlement administrator did not include 21,584 potential class members because Tinder did not have an email address for them. [3-SER-582; ER-67]

### 3. The arbitration agreement is enforceable.

Objectors contend the arbitration agreement is unenforceable because the TOU, which contains it, is supposedly unconscionable. Objectors base this argument on the TOU's limitation-of-liability provision and a provision—found only in an early version of the TOU dated November 1, 2014—that included a one-year limitations period to file claims against Tinder.[35]

Neither TOU provision is (or was, in the latter case) part of the arbitration agreement itself, so neither has any effect on the validity of that agreement. Furthermore, the limitation-of-liability provision, far from being unconscionable, is enforceable for reasons discussed above. And the short-lived statute-of-limitations provision was likewise enforceable. *See Zalkind v. Ceradyne, Inc.*, 194 Cal. App. 4th 1010, 1030 (2011) ("[A]greements to shorten the statute of limitations do not violate public policies and are enforced if reasonable."); *Moreno v. Sanchez*, 106 Cal. App. 4th 1415, 1430 (2003); *Brisbane Lodging, L.P. v. Webcor Builders, Inc.*, 216 Cal. App. 4th 1249, 1262 (2013).

But even if neither provision were enforceable under California law (assuming California law applied despite the Texas choice-of-law provision), neither was so integral to the TOU as to render the entire TOU, including the arbitration agreement, unenforceable. Rather, if either provision were unenforceable, it could simply be severed from the TOU. The TOU expressly contemplates such an eventuality, stating—of necessity, given Tinder's nationwide presence—that its

---

[35] *Compare* ER-367-68 (one-year clause in November 2014 version) *with* 1-SER-1-2 and 3-SER-589, 600-01 (absent in subsequent versions).

provisions do not apply in states where they would be unenforceable.[36] [1-SER-2; 3-SER-601]

### 4. The arbitration agreement renders contested class certification highly improbable.

Although class certification is appropriate for purposes of implementing the settlement, in a contested setting pervasive manageability issues arising from the arbitration agreement would likely preclude class treatment. The arbitration agreement's class action waiver bars all users who are bound by it from participating in a class in this case. *See Iskanian v. CLS Transp. Los Angeles*, *LLC*, 59 Cal. 4th 348, 364 (2014) (class action waivers in arbitration agreements are enforceable, as Federal Arbitration Act preempts any state law to the contrary). And where, as here, most of the putative class is bound by an arbitration and class waiver, class certification, if contested, is not viable. *See, e.g., O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087 (9th Cir. 2018) (decertifying 240,000-member class on basis of valid arbitration clause); *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 861 (D. Md. 2013) ("[W]here certain members of a class are subject to contracts containing arbitration clauses, while other class members are not, those differences in contractual relationships destroy[] the commonality … of the class."); *Tan v. Grubhub, Inc.*, 2016 WL 4721439, at *3 (N.D. Cal. July 19, 2016).

Furthermore, as to the balance of the class who did not expressly assent to the arbitration agreement, their circumstances all implicate individual issues whether a

---

[36] Even if the statute-of-limitations provision were unenforceable and could not be severed from the TOU, that provision would have no effect on the enforceability of post-November 2014 versions of the TOU which did not contain that provision.

particular class member who did not expressly agree to the TOU through the sign-in-wrap method is nonetheless bound by the arbitration agreement. *See Conde v. Sensa*, 2018 WL 4297056 (S.D. Cal. Sept. 10, 2018) (class certification denied due to individual issues regarding whether various class members agreed to arbitration); *Pablo v. Servicemaster Global Holdings, Inc.*, 2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) (same).

One of those is Candelore himself, who, unlike the vast majority of settlement class members, would contend he is not subject to the TOU's arbitration provision. [ER-162] The need for an individualized determination of this issue means he "is not an adequate representative, and [his] claims lack[] typicality." *Avilez v. Pinkerton Govt. Sys., Inc.*, 596 F. App'x 579, 579 (9th Cir. 2015). Such circumstances would likely doom his class certification bid. *See id.*; *see also In re Checking Account Overdraft Litig.*, 780 F.3d 1031, 1039 (11th Cir. 2015) ("[T]he named plaintiffs lack standing to assert any rights the unnamed putative class members might have to preclude Wells Fargo from moving to compel arbitration because the named plaintiffs have no cognizable stake in the outcome of that question."); *Conde v. Open Door Mktg., LLC*, 223 F. Supp. 3d 949, 960 (N.D. Cal. 2017) ("Plaintiffs are not personally affected by the arbitration agreements at issue because they have not signed agreements that contain similar terms. … Thus, the defenses the named Plaintiffs are subject to are not typical of the class as proposed."); *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 987-88 (N.D. Cal. 2019) ("it is not clear that Berman would be able to litigate adequately the enforceability of the arbitration agreement on the [] website if he is not subject to

46

it"); *Campanelli v. Image First Healthcare Laundry Specialists, Inc.*, 2018 WL 6727825, at *7 (N.D. Cal. Dec. 21, 2018) (denying class certification: "[Plaintiff] is neither subject to an arbitration clause nor a class/collective action waiver. Thus, he is not an adequate representative and his claims lack typicality with respect to putative Rule 23 plaintiffs who have signed the DRA or the Employment Agreement.").

Finally, and importantly, class litigation would not be a "superior" method to pursue such claims because individual claimants can recover $4,000 in statutory damages, as well as attorneys' fees, if they prevail on an Unruh Act claim. *See*, *e.g.*, *Reese v. Wal-Mart Stores, Inc.*, 73 Cal. App. 4th 1225, 1238 (1999) (denying class certification for Unruh Act claim on superiority grounds due to other available remedies); *Slakey Bros. Sacramento v. Parker*, 265 Cal. App. 2d 204, 209-10 (1968) (class certification unnecessary "where the amount of each individual recovery is substantial and separate actions are economically feasible"); *Dean Witter Reynolds, Inc. v. Superior Court*, 211 Cal. App. 3d 758, 773 (1989) (class action not superior where streamlined mechanisms for individual recovery exist). That such individual actions are indeed viable is confirmed by Tinder's involvement in many individual arbitration proceedings commenced by Davis & Norris based upon this same theory of liability.[37] [3-SER-607] And, as discussed below, while statutory damages could potentially be recovered in individual cases, recovery on a class-wide basis would

---

[37] Tinder's arbitration agreement also allows for suit in small claims court as an alternative to arbitration. [1-SER-601]

amount to an unconstitutional penalty, ultimately rendering class litigation an inferior method for determining such claims.

### F. The Constitution Prohibits Disproportionate Statutory Damages.

Even were a plaintiff to advance this expansive class past certification and then to trial and judgment, the Constitution would prohibit the enormous potential award (*i.e.*, at least $4,000 in statutory damages for each of the approximately 240,000 class members, totaling at least $960 million) that serves as Objectors' sole yardstick of "value" for this case.[38] Class members, by definition not eligible for a youth discount, paid a modest monthly differential—$10 for Tinder Plus and $15 for Tinder Gold. Even assuming, *arguendo*, that this differential could qualify as actual damages—an assumption without any support in the caselaw since they would have paid the same amount absent the youth discount—it would total only a few million dollars on a class-wide basis. Under these circumstances, a judgment of $960 million would be so grossly disproportionate to any purported actual damages that it could not withstand constitutional scrutiny. *See, e.g., St. Louis, I.M. & S. Ry. Co.*

---

[38] Citing disability-access cases, Objectors suggest that class members who made multiple subscription payments could recover $4,000 for each payment. (*See* AOB 18, n.6.) No court has ever awarded damages for not obtaining a price discount, let alone countenanced multiple awards, which would clearly be impermissible. *See Hale v. Morgan*, 22 Cal. 3d 388, 398-402 (1978) (statutory minimum damages can be unconstitutional, especially where extenuating circumstances are disregarded and penalties multiply regardless of number or nature of actual violations); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1309-10 (9th Cir. 1990) (aggregated statutory damages improper); *Walnut Creek Manor v. Fair Emp't & Hous.*, 54 Cal. 3d 245, 270 (1991) ("for the purposes of the authorized remedies, multiple acts of discrimination against the same complainant on the same unlawful basis establish only one unlawful practice").

*v. Williams*, 251 U.S. 63, 66-67 (1919) (statutory penalty violates due process when it is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable"); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996) (extending *St. Louis* to punitive damages); *cf. Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 723 (9th Cir. 2010) (declining to deny class certification based on FACTA damages exposure as inconsistent with congressional intent, but recognizing that any disproportionate award could later be reduced).

## V. Objectors' Remaining Arguments Provide No Basis to Disturb the Settlement.

Objectors' remaining challenges are irrelevant, factually incorrect, or otherwise warrant limited discussion. They argue, for example, that it was improper for Tinder to oppose Candelore's attempt to intervene and rewrite the settlement of another Tinder Plus case, *Hansen*.[39] But neither the timing of the *Hansen* settlement nor the settlement's release provision was a response to the *Candelore* appellate decision. [3-SER-609-10] And when Candelore tried to intervene based on a purported concern that his claims might be encompassed in the release, Tinder merely argued that the effect of the *Hansen* release on *Candelore* or any other case should be decided, if at all, in those other matters. [3-SER-613-17] The *Hansen*

---

[39] Tinder's counsel used the class notice in the *Hansen* settlement as a template for the class notice in this case and inadvertently retained the Civil Code citation for the Dating Services Contract Act—the subject of the *Hansen* case—in lieu of the Unruh Act. [3-SER-610] Nonetheless, the notice in this case cited the Unruh Act by name and explained that the claim was based on alleged age discrimination. [ER-72] That was more than sufficient for purposes of settlement notice. *See Lane*, 696 F.3d at 826 (class notice "does not require detailed analysis of the statutes or causes of action").

settlement was not an attempt to end-run *Candelore*, nor does any of this bear on the adequacy of the *Kim* settlement under review.

Objectors also protest Tinder's supposed failure to provide Kim's counsel before this settlement with information regarding its sign-in-wrap method of obtaining assent to the TOU. That assertion is of doubtful relevance but also incorrect; Tinder provided this information to class counsel in the course of moving to compel arbitration in this very case. [ER-364-66]

In addition, Objectors complain that Kim and Tinder did not alert Candelore's (and Objectors') counsel, or the state court, to the settlement discussions. That is true but irrelevant. No legal or ethical obligation requires that all potentially interested constituencies be notified of or invited to participate in settlement discussions, and Objectors point to none.[40] The notice and objection process, of which Objectors have availed themselves, provides a sufficient forum for all recognized stakeholders in a potential class settlement.

## CONCLUSION

The district court properly applied the appropriate Rule 23(e)(2) factors and correctly found the settlement in this case to be fair, reasonable, and adequate. The settlement was reached via arm's-length negotiations overseen by a distinguished mediator and offers substantial automatic relief to every class member, as well as additional, optional relief, including cash. Objectors cite no case, and none exists, where a similarly structured settlement has been found to be inadequate. Further,

---

[40] Had Tinder invited Candelore to participate in settlement discussions, Objectors doubtless would complain instead that Tinder had tried to initiate a reverse auction.

326367475.2

the settlement was favorably received—no class member without an attorney angling for fees has objected, and only two out of 240,000 have independently opted out. Far from inadequate, the settlement is a more than fair resolution of lawyer-driven litigation seeking merely to leverage statutory damages in a no-injury case. The district court's approval of the settlement should be affirmed.

June 2, 2020

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

By: s/Donald R. Brown
   *Attorneys for Defendants/Appellees*
   Tinder, Inc., et al.

326367475.2

# EXHIBIT 1—EXAMPLES OF YOUNG-ADULT DISCOUNTS

- https://www.theoldglobe.org/other-programming/under-30-program/ (**under-30 discount for theater tickets**)

- https://www.act-sf.org/home/box_office/special_offers.html (**same**)

- https://www.broadwaysacramento.com/35-under-35-club/ (**under-36 discount for theater tickets**)

- http://www.skichinapeak.com/lift-tickets (**under-30 discount for ski-lift tickets**)

- https://www.healthcare.gov/choose-a-plan/catastrophic-health-plans/ (**under-30 health plan**)

- https://www.latimes.com/local/la-me-c1-city-club-20140108-dto-htmlstory.html (**under-30 discount for club dues**)

- https://www.sohohouse.com/en-us/membership/house (**under-27 membership rate**)

- https://hillcrestcountryclub.com/member-information (**under-35 membership rate**)

- https://silverado-property.com/2017-silverado-country-club-resort-membership-information/ (**discounted fees for younger members**)

- https://www.clubcorp.com/Clubs/City-Club-Los-Angeles/Membership/Membership-Types (**under-41 discount on club dues**)

- https://www.americanbar.org/groups/environment_energy_resources/membership/faq-aba-new-membership-model/ (**tiered pricing based on years in practice**)

- https://www.eurail.com/en/eurail-passes/global-pass (**under-28 discount for train pass**)

- https://www.statravel.com/youth-travel-card.htm (**under-31 discount for travel card**)

- https://www.bayclubs.com/membershipguidelines/ (**under-30 membership discount**)

- https://raceroster.com/events/2018/15795/t9-mermaid-triathlon-and-duathlon-capitola (**under-25 discount for athletes**)

- https://www.scfymca.org/main/rates-and-categories/ (**under-25 discount for gym members**)

- https://ymcaeastbay.org/join (**under-27 discount for gym members**)

- https://www.elkinsranchgc.com/course/rates/ (**under-30 discount**).

326367475.2

## Certificate of Compliance

Pursuant to Rule 32 of the Federal Rules of Appellate Procedure, and Circuit Rule 32-1, I certify that this Brief is proportionately spaced, has a typeface of Times New Roman, 14 point, and contains 13,909 words, including footnotes and Exhibit 1 to this Brief, but excluding the Corporate Disclosure Statement, the Table of Contents, the Table of Authorities, and this Certificate of Compliance. This brief was created in Microsoft Word, and I have relied on that software's word-count feature to calculate the word count.

June 2, 2020                     Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

By: s/Donald R. Brown
      *Attorneys for Defendants/Appellees*
      Tinder, Inc., et al.

326367475.2